**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GORILLA TECHNOLOGY GROUP, INC.

                              Plaintiff,

        -against-

SHADYSIDE PARTNERS, LLC *DBA* CULPER
RESEARCH and CHRISTIAN LAMARCO,

                      Defendants.

**ECF CASE**

**Case No. 1:25-cv-03142-JSR**

<u>**ORAL ARGUMENT**</u>
<u>**REQUESTED**</u>

---

**MEMORANDUM OF LAW OF DEFENDANTS SHADYSIDE PARTNERS, LLC AND
CHRISTIAN LAMARCO IN SUPPORT OF THEIR MOTION TO DISMISS**

---

Patrick L. Rocco
Tyler E. Van Put
FLEISCHMAN BONNER & ROCCO LLP
445 Hamilton Ave., Suite 402
White Plains, New York 10601
Tel:    (914) 278-5100
Fax:   (917) 591-5245
Email: procco@fbrllp.com
       tvanput@fbrllp.com

*Counsel for Defendants Shadyside Partners, LLC*
*and Christian Lamarco*

Dated: May 22, 2025

TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT .............................................................................. 1

FACTS ........................................................................................................................ 2

    A.  Background ................................................................................................... 2

    B.  The Report ................................................................................................... 3

ARGUMENT ............................................................................................................. 5

  I.    DEFENDANTS' STATEMENTS ABOUT A PUBLICLY
      TRADED COMPANY ARE PROTECTED OPINIONS
      NOT ACTIONABLE AS A MATTER OF LAW……………………………............6

    A.   The Challenged Statements Are Protected Opinion ............................................. 6

      a.   The Context of the Challenged Statements Makes Clear They are
         Statements of Opinion, Not Fact…………………………….....……..……………7

      b.   The Challenged Statements Disclose the Facts on Which They Are Based,
         and Therefore Are Pure Opinion Not Actionable as Defamation...................10

        i.   Disclosed Facts Supporting Opinion on $1.8 Billion Signed Contract….11

        ii.   Disclosed Facts Supporting Opinion on Thai Police Contract…………..13

        iii.   Disclosed Facts Supporting Opinion on Gorilla Hardware……………...15

  II.   PLAINTIFF HAS NOT PLAUSIBLY ALLEGED DEFENDANTS
      PUBLISHED THE STATEMENTS WITH ACTUAL MALICE…..…………............17

  III.  PLAINTIFF'S TRADE LIBEL CLAIM MUST BE DISMISSED FOR
      FAILURE TO ALLEGE THE REQUIRED SPECIAL DAMAGES…………...............20

  IV.  DEFENDANTS ARE ENTITLED TO ATTORNEY'S FEES
      UNDER NEW YORK'S ANTI-SLAPP STATUTE…………...........................................23

CONCLUSION...................................................................................................... 24

i

TABLE OF AUTHORITIES

**Case**                                                                                                    **Page(s)**

*1st Amend. Praetorian v. New York Times Co.,*
    2025 WL 949575 (S.D.N.Y. Mar. 28, 2025)……………………………….…18, 20

*Adelson v. Harris,*
    774 F.3d 803 (2d Cir. 2014) ……………………………………………….……23

*Adelson v. Harris,*
    973 F. Supp. 2d 467 (S.D.N.Y. 2013) ……………………………………..…… 6

*Angio-Med. Corp. v. Eli Lilly & Co.,*
    720 F. Supp. 269 (S.D.N.Y. 1989) ……………………………………….…... 21

*Aronson v. Wiersma,*
    65 N.Y.2d 592 (1985) ……………………………………………………..…. 7, 8

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ………………………………………………..…..5, 6, 18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ………………………..…………………………….5, 6, 18

*Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC,*
    151 F. Supp. 3d 287 (E.D.N.Y. 2015)…………………………………….... 10

*Biro v. Condé Nast,*
    807 F.3d 541 (2d Cir. 2015) ……………………………………………… 5, 6

*Biro v. Conde Nast,*
    963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd,* 807 F.3d 541 (2d Cir. 2015),
    and *aff'd,* 622 F. App'x 67 (2d Cir. 2015) ………………………………6, 17, 18,
                                                                                     19, 20

*Bloom v. A360 Media LLC,*
    735 F. Supp. 3d 466 (S.D.N.Y. 2024) ……………………………..……… 6, 17, 18,
                                                                                     20

*Bobulinski v. Tarlov,*
    758 F. Supp. 3d 166 (S.D.N.Y. 2024) ………………………………………... 23

*Brian v. Richardson,*
    87 N.Y.2d 46 (1995) ……………………………………………………9, 10

*BYD Co. Ltd. v. VICE Media LLC,*
    531 F. Supp. 3d 810 (S.D.N.Y. 2021), *aff'd,*
    2022 WL 598973 (2d Cir. Mar. 1, 2022)...............................................18

*Cambridge Assoc. v. Inland Vale Farm Co.,*
   116 A.D.2d 684 N.Y.S.2d 751, 753 (2d Dept. 1986) ……………......……………… 21

*Carroll v. Trump,*
   590 F. Supp. 3d 575 (S.D.N.Y. 2022) ……………………………………....……… 23

*Cassava Scis., Inc. v. Bredt,*
   2024 WL 555484 (S.D.N.Y. Jan. 3, 2024), *report and recommendation adopted,*
   2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) ……………………………....……… 10, 11

*Celle v. Filipino Rep. Enters. Inc.,*
   209 F.3d 163 (2d Cir. 2000) …………………………………………….…… 6, 7, 20

*Chau v. Lewis,*
   771 F.3d 118 (2d Cir. 2014) ……………………………………………….……… 7

*Cotton v. Slone,*
   4 F.3d 176 (2d Cir. 1993) ……………………………………………….……… 23

*Dillon v. City of New York,*
   704 N.Y.S.2d 1 (1st Dep't 1999) …………………………………………….... 10

*Drug Rsch. Corp. v. Curtis Pub. Co.,*
   7 N.Y.2d 435 (1960) …………………………………………………….……… 22

*Eminah Props. LLC v. Energizer Holdings, Inc.,*
   531 F. Supp. 3d 593 (E.D.N.Y. 2021) …………………………………….……… 22, 23

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC,*
   194 F. Supp. 3d 263 (S.D.N.Y. 2016) …………………………………....……… 21

*Eros Int'l, PLC v. Mangrove Partners,*
   140 N.Y.S.3d 518 (App Div. 1st Dep't 2021) …………………………....……… 11

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,*
   314 F.3d 48 (2d Cir. 2002) …………………………………………………....… 21

*Freeman v. Johnston,*
   84 N.Y.2d 52 (1994) ……………………………………………………….……… 18

*Ganske v. Mensch,*
   480 F. Supp. 3d 542 (S.D.N.Y. 2020)………………………......……………....… 10

*Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.,*
   2020 WL 6323462 (S.D.N.Y. Oct. 28, 2020) ……………………......…………12, 14, 16

*Garrison v. Louisiana,*
379 U.S. 64 (1964) ………………………………………………………....18

*Hakimi v. Guidant Global,*
2023 WL 8005321 (S.D.N.Y. Nov. 17, 2023) ……………………….…….6

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
491 U.S. 657 (1989) ……………………………………………………....18, 19, 20

*Heilbut v. Cassava Sciences, Inc.,*
2025 WL 919654 (S.D.N.Y. Mar. 26, 2025) ……………………………… 17

*Immuno AG v. Moor-Jankowski,*
77 N.Y.2d 235 (1991) ……………………………………………....…….. 7

*Kirby v. Wildenstein,*
784 F. Supp. 1112 (S.D.N.Y. 1992) …………………………………….… 21, 22

*Mann v. Abel,*
10 N.Y.3d 271 (2008) ……………………………………………....…….. 7

*Masson v. New Yorker Magazine,*
501 U.S. 496 (1991) …………………………………………....…….17, 18

*McDougal v. Fox News Network, LLC,*
489 F. Supp. 3d 174 (S.D.N.Y. 2020) ……………………………….…… 18

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP,*
2018 WL 847014 (S.D.N.Y. Jan. 12, 2018), *report and recommendation adopted,*
2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018) …………………….…7, 17, 20

*New York Times Co. v. Sullivan,*
376 U.S. 254 (1964) ……………………………………………....……17

*Nicosia v. Amazon.com, Inc.,*
834 F.3d 220 (2d Cir. 2016) ……………………………………….…… 2

*NOVAGOLD Res., Inc. v. J Cap. Rsch. USA LLC,*
2022 WL 900604 (E.D.N.Y. Mar. 28, 2022) ……………………………....22

*Palin v. New York Times Co.,*
510 F. Supp. 3d 21 (S.D.N.Y. 2020) …………………………….......…… 17

*Ruder & Finn Inc. v. Seaboard Sur. Co.,*
52 N.Y.2d 663 (1981) ………………………………………………....… 21

*Sandals Resorts Int'l Ltd. v. Google, Inc.,*
 925 N.Y.S.2d 407 (1st Dep't 2011) …………………………………….... 7, 8

*Silvercorp Metals Inc. v. Anthion Mgmt. LLC,*
 36 Misc. 3d 1231(A), 959 N.Y.S.2d 92, 2012 WL 3569952 (Sup. Ct. 2012) …..…. 9, 11

*Soter Techs., LLC v. IP Video Corp.,*
 523 F. Supp. 3d 389 (S.D.N.Y. 2021) …………………………………......……. 12, 20, 21

*Soter Techs., LLC v. IP Video Corp.,*
 2021 WL 744511 (S.D.N.Y. Feb. 26, 2021) …………………………………22, 23

*Steinhilber v. Alphonse,*
 68 N.Y.2d 283 (N.Y. 1986) …………………………………………..… 7, 10

*Stern v. Cosby,*
 645 F. Supp. 2d 258 (S.D.N.Y.2009) …………………..……………..…… 18

*Tannerite Sports, LLC v. NBCUniversal News Grp.,*
 864 F.3d 236 (2d Cir. 2017) …………………………………………..… 12, 14, 16

*Trump v. Trump,*
 80 Misc. 3d 765 (N.Y. Sup. Ct. 2023), *aff'd*, 227 A.D.3d 635 (1st Dep't 2024)..… 1

*Yangtze River Port and Logistics Ltd. v. Research,*
 2020 WL 905770 (N.Y. Sup. Ct. Feb. 25, 2020) …………………………..…… 8

**Rule / Statute**                **Page(s)**

Civil Rights Law Section 70-a…………………………………………………...23, 24

Civil Rights Law Section 76-a………………………………………………...2, 17

Fed. R Civ. P. 12(b)(6)………………………………………………….. 1, 5, 6

Defendants Shadyside Partners LLC and Christian Lamarco (collectively "Defendants") respectfully submit this Memorandum of Law in support of their motion to dismiss with prejudice the Complaint of plaintiff Gorilla Technology Group Inc. ("Gorilla") pursuant to Fed. R Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Christian Lamarco and his company Shadyside Partners LLC ("Shadyside") both reside in New York City.[1]  Since 2019, Shadyside has published its views on publicly-traded companies under the name Culper Research, in homage to the Culper spy ring led by General George Washington during the America Revolution.  *Id.*  Culper writes about businesses that it believes have misrepresented their operations, failed to disclose significant risks, misused capital, possess accounting irregularities, or otherwise deceived investors.  *Id.*  These views are based on extensive research, which Culper also provides publicly for free on its website.  On April 4, 2025, Defendants published a Report on Gorilla Technology Group, a copy of which is attached as Exhibit 1 to the Complaint (the "Report").

Culper's critical views of Gorilla were accompanied by its extensive research, including analysis of Gorilla's financial statements and public comments, government databases, expert calls, site visits, geo-locating, and communications with on-the-ground sources.

This action is a blatant attempt by Gorilla, a publicly traded company, to use a baseless lawsuit[2] to intimidate, retaliate against, and otherwise silence Defendants' protected speech—

---

[1] https://culperresearch.com/about-us.

[2] "SLAPP suits—or strategic lawsuits against public participation—are characterized as having little legal merit but 'filed nonetheless to burden opponents with legal defense costs and the threat of liability and to discourage those who might wish to speak out in the future.'" *Trump v. Trump*, 80 Misc. 3d 765, 771–72 (N.Y. Sup. Ct. 2023), *aff'd*, 227 A.D.3d 635 (1st Dep't 2024) (citation omitted).

because that speech was critical of Plaintiff. Gorilla's Complaint is sanctionable under New York's anti-SLAPP statute because Plaintiff's claims of defamation and trade libel have no substantial basis in law or in fact and therefore must be dismissed. The Report Plaintiff attacks expresses inactionable protected opinions that are grounded in extensive research, spanning corporate filings, site visits, interviews, photographs, and Gorilla's own representations, all of which are hyperlinked or otherwise fully disclosed to the reader. Plaintiff fails to allege *any* facts to demonstrate that *any* statements in the Report are false, further dooming Plaintiffs' claims.

The Complaint also fails to allege an adequate factual basis to demonstrate that Defendants acted with the actual malice required to plead defamation and trade libel against a public company under New York common law and Civil Rights Law Section 76-a. Lastly, Plaintiff's trade libel claim fails to allege the required special damages with sufficient detail.

## FACTS

### A. Background

Gorilla was incorporated in 2001 in the Cayman Islands' infamous Ugland House, which former President Barack Obama called "the biggest tax scam in the world." Ex. 1 at 2, 7.[3] Gorilla's global headquarters are located within a temporary office space above a London hair salon and spa. *Id*. Gorilla's principal place of business is Taiwan. ¶10.[4] Gorilla went public through a SPAC merger in 2021 and thereby became listed on the NASDAQ stock exchange. ¶¶10, 16. Gorilla purports to be a "high growth data analytics company focused on video

---

[3] Citations to "Ex. 1 at __" refer to specific pages of the Report attached as Exhibit 1 to the Complaint. ECF Doc. #1-1. In resolving Defendants' motion, the Court may consider the documents incorporated by reference in the Complaint. *See, e.g., Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016).

[4] Citations to "¶ __" refer to specific pages of the Complaint. ECF Doc. #1.

intelligence, content management, and cyber security appliances, software and services." ¶10. From mid-2024 through early-2025, Gorilla's share price skyrocketed from $2.57 per share on July 5, 2024 to $44.15 per share on March 5, 2025 (the stock's peak).[5]  However, by April 3, 2025—a day *before* the Report was released—Gorilla's shares had declined 57% to $18.99 per share. *Id*.

**B.  The Report**

        Both Culper's website homepage and the Report begin with a disclaimer that fully discloses the contents as reflecting the opinions of the author, presented "as is" and fully disclosing Defendants' short position in Gorilla stock.  Ex. 1 at 1-2.  The Report details nine separate causes for concern, each of which is accompanied in the Report by Defendants' extensive research.  However, the Complaint only challenges three of these opinions as allegedly defamatory statements.  Those three challenges stem from the following Report excerpts:

1.  **Gorilla's False Claim About a $1.8B "Signed Contract" with Thailand's Electricity Authority**:  The Report notes:

    -  On March 5, 2025, Gorilla claimed to have signed a 15-year, $1.8 billion deal with Thailand's Provincial Electricity Authority ("PEA") for "smart grid and AI-powered energy transformation" services.  Five days later, Gorilla announced the "formal launch of the initial phases" of the initiative. [CEO] Chandan insists this is a "signed contract" and even comes with a 10% ($180 million) prepayment.  We think this is a total lie.

    -  Thai law requires public disclosure of awards over $60,000 USD.  No such records exist for this supposed "signed contract."  We were further unable to find a single third-party mention of the deal, despite its size.

    -  **<u>We spoke directly with the Assistant Manager of the PEA's Smart Grid Division, who stated unequivocally that no such contract exists – certainly not for $1.8 billion</u>**

    Ex. 1 at 2-3 (emphasis in original).

_____

[5] https://www.nasdaq.com/market-activity/stocks/grrr.

2. **Gorilla's False Claim About its $50 to $60 Million Contract with The Royal Thai Tourist Police.** The Report notes:

- On January 21, 2025, Gorilla announced a 5-year partnership with the Royal Thai Tourist Police to "implement state-of-the-art AI-driven solutions across the nation's most iconic and visited tourist destinations" – in layman's terms, install cameras. **Chandan claimed the deal is worth $50 to $60 million.**

  Given this purported size, we'd expect the deal to be listed in public disclosures. Yet again, no record exists. Our sources spoke directly with the Thai Tourist Police and **told us that he suspects the deal actually consists of just 100 to 150 cameras at $200 per camera, or a total purchase price of $20,000 to $30,000 USD – just 0.05% of what CEO Chandan claims**. This figure also explains why the deal is not listed publicly, as it falls below the $60,000 disclosure threshold.

  Corporate records show Gorilla formed its Thai subsidiary just a week earlier, on January 13, 2025, with ~$88,000 in capital. Its listed address is a virtual office.

- We retained a Thai law firm to investigate the deals and Gorilla's operations in Thailand. They told us that "we have found no evidence supporting the Company's investment in Thailand."

Ex. 1 at 3-4 (emphasis in original).

3. **Gorilla's Misstatements About its Hardware**. The Report notes, in part:

- Gorilla and its CEO Jay Chandan now promote the Company as a "dominant" provider of "AI hardware" and services across the globe. **Gorilla's website showcases this so-called "AI hardware." A simple reverse image search reveals that Gorilla has merely slapped its own logo on top of old Dell desktop PCs and Telpo cameras**, readily available for purchase on eBay or any number of online retailers for a few hundred dollars.

Ex. 1 at 2 (emphasis in original).

Notably, each of these opinions is accompanied by disclosed facts which form the grounds for Defendants' opinions, none of which Plaintiff challenges as false.

The Report also highlights other shareholder concerns with Gorilla, which the Complaint does not challenge:

4. **"Global Edge Fund" Relationship.** Ex. 1 at 13-17 (questioning Gorilla's claim that it partnered with a "$100 billion" fund, and would generate $25 to $30 billion in revenues from a partnership with this fund, based on Culper's research revealing numerous red

4

flags among the fund's principals and associates, including past ties to dozens of lawsuits, allegations of stolen rental cars, forged checks, and a crypto Ponzi scheme, and previous instances of these individuals enacting similar "bait and switch" schemes).

5. **Gorilla's Misrepresentation of its U.S. Headquarters.** *Id*. at 20-21 (questioning Gorilla's claimed November 2024 launch of its Seattle Headquarters, which Gorilla called "a milestone" and a "central hub" because Culper's research, including site visits, revealed, among other things, that the "headquarters" was a rented mailbox at a Regus space).

6. **Undisclosed Related Party Deals**. *Id*. at 27-28 (detailing findings suggesting that Gorilla had engaged in two separate related-party transactions that were not properly disclosed in the Company's SEC filings).

7. **Gorilla's Misstatements About its Egyptian Business**. *Id*. at 5, 22-25 (disclosing several facts that questioned the accuracy of Gorilla's claims to be constructing multiple data centers in Egypt, and highlighting concerns in Gorilla's financial statements related to its business in Egypt).

8. **Gorilla's Claims of its BroadSat Partnership.** *Id*. at 21-22 (disclosing various facts that questioned the accuracy of Gorilla's claim to have signed a $20M annual partnership with Boston-based "BroadSat" just one week after Gorilla purportedly opened its U.S. headquarters).

9. **Red Flags in Gorilla's Auditor, Former CFO, and Financial Statements.** *Id*. at 24-27 (noting Gorilla's auditor changes, and that Gorilla's former CFO also served as CFO of Lihua International, whose stock collapsed and CEO was detained after finding Lihua had hidden a mountain of debt).

## ARGUMENT

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). That standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678). Plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully" and may not rely on "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.  "If plaintiff has 'not nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed.'" *Bloom v. A360 Media LLC*, 735 F. Supp. 3d 466, 471 (S.D.N.Y. 2024) (Rakoff, J.), quoting *Twombly*, 550 U.S. at 570.

The early disposition of defamation claims is particularly favored.  "Because a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage." *Hakimi v. Guidant Global*, 2023 WL 8005321, at *7 (S.D.N.Y. Nov. 17, 2023) (quoting *Adelson v. Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013)).  Thus, Rule 12(b)(6) "not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015), and *aff'd*, 622 F. App'x 67 (2d Cir. 2015).  Here, several pleading deficiencies mandate dismissal of Gorilla's Complaint.

## I.    DEFENDANTS' STATEMENTS ABOUT A PUBLICLY TRADED COMPANY ARE PROTECTED OPINIONS NOT ACTIONABLE AS A MATTER OF LAW

### A.  The Challenged Statements Are Protected Opinion

Under New York law, "a plaintiff must establish five elements to recover in libel: 1) a written defamatory statement of fact concerning the plaintiff; 2) publication to a third party; 3) fault (either negligence or actual malice depending on the status of the libeled party); 4) falsity of the defamatory statement; and 5) special damages or per se actionability (defamatory on its face)." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).  In determining whether a statement is defamatory, a court must consider "the context of the entire statement ...,

tested against the understanding of the average reader, and if [the words are] not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction."  *Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985).

Here, Gorilla's defamation claims against Defendants fail at the outset because the Complaint does not plead that the Report made any defamatory statements of fact.  *See Chau v. Lewis*, 771 F.3d 118, 128 (2d Cir. 2014) ("only factual statements are actionable as defamation or libel").  The Report offers only opinions, which the Constitutions of New York and the United States both protect from liability.  *See Celle*, 209 F.3d at 178 (statements of opinion are entitled to "absolute" protection); *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, 2018 WL 847014, at *6 (S.D.N.Y. Jan. 12, 2018), *report and recommendation adopted*, 2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018) ("Statements of opinion are never actionable.").

### a.  The Context of the Challenged Statements Makes Clear They are Statements of Opinion, Not Fact

Whether a particular statement expresses fact or opinion is a question of law for the Court and "must be answered on the basis of what the average person hearing or reading the communication would take it to mean."  *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290 (N.Y. 1986).  To make that determination, New York courts use a multi-part test hinging on "whether the statement at issue has a precise meaning so as to give rise to clear factual implications," "the degree to which the statements are verifiable," and "the full context of the communication." *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 412 (1st Dep't 2011) (internal citations and quotations omitted); *see also Mann v. Abel*, 10 N.Y.3d 271, 276 (2008).

In assessing a statement, courts must look to "the content of the whole communication," as well as "its tone and apparent purpose," rather than isolating the individual alleged defamatory statements.  *See Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991); *Aronson*, 65

N.Y.2d at 594 (noting importance of analyzing "context of the entire statement"); *Sandals*

*Resorts*, 925 N.Y.S.2d at 412 ("[S]ifting through a communication for the purpose of isolating

and identifying assertions of fact should not be the central inquiry.") (citations omitted).

 Here, the context makes clear that the Report contains opinions—not statements of fact.

First, the Report's disclaimers signify that the Report offers only opinions about Gorilla:

> Culper makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. ***Research may contain*** forward-looking statements, estimates, projections, and ***opinions with respect to among other things, certain accounting, legal, and regulatory issues the issuer faces and the potential impact of those issues on its future business, financial condition and results of operations, as well as more generally, the issuer's anticipated operating performance, access to capital markets, market conditions, assets and liabilities***. ***Such*** statements, estimates, projections and ***opinions may prove to be substantially inaccurate and are inherently subject to significant risks and uncertainties beyond Culper's control. All expressions of opinion are subject to change without notice***, and Culper does not undertake to update or supplement this report or any of the information contained herein.

Ex. 1 at 1 (emphasis added).  The Report further tells the reader to "do your own research and

due diligence, consult your own financial, legal, and tax advisors before making any investment

decision with respect to transacting in any securities covered herein."  *Id.*

 Next, the Report repeatedly uses the terms "we believe" or "we think" to introduce the

Report's core statements about Gorilla's misconduct, further signaling that those statements are

Culper's opinion.  *See e.g.*, *Yangtze River Port and Logistics Ltd. v. Research*, 2020 WL 905770,

at *8 (N.Y. Sup. Ct. Feb. 25, 2020) (shortseller's statements were protected "pure opinion"

because they contained disclaimers, were couched with terms like "we believe" and "we think,"

and were accompanied by a recitation of facts on which they were based).  For example, the

Report notes:

- "*We think* [Gorilla's claim of a $6 billion pipeline] it's almost 100% bullshit" and "*We think* [the $1.8 billion contract with the Thailand Electricity Authority] is a total lie."  Ex. 1 at 2.

- "*We think* Gorilla is similarly using Brasilinvest and ADIG as a fraudulent stamp of legitimacy." *Id*. at 4.

- "*We think* Gorilla's technological abilities are practically non-existent." *Id*. at 8

- "Gorilla announced two blockbuster deals in Thailand that the Company claims are worth nearly $2 billion. *We believe* both were effectively fabricated." *Id*. at 10.

- "CEO Chandan claimed the deal to be worth $50 to $60 million. *We believe* it's for about $25,000." *Id*. at 11.

- "*We believe* these figures are pure fantasy." *Id*. at 14.

- "*We think* Gorilla's arrangement with Global Edge pulls from the same playbook – use partnerships a fraudulent seal of approval." *Id*. at 17.

(emphasis added in each quote above).

Third, the Report specifically discloses Defendants' short position in Gorilla stock, making clear that Defendants stood to benefit financially if Gorilla's stock declined in value—*i.e.*, that the author has a bias.[6]  That disclosure itself strongly suggests that the Report contains protected opinions.  *See Silvercorp Metals Inc. v. Anthion Mgmt. LLC*, 36 Misc. 3d 1231(A), 959 N.Y.S.2d 92, 2012 WL 3569952 at *9 (Sup. Ct. 2012) (disclosure of short position in plaintiff's stock demonstrates ulterior motive "indicat[ing] to the reader that the author is expressing his opinion"); *see also Brian v. Richardson*, 87 N.Y.2d 46, 53 (1995) (the "immediate context in which the challenged statements were made," including author's disclosure that "he was not a disinterested observer," "supports the conclusion that the specific accusations of which plaintiff

---

[6] The Report notes that: (a) "[w]e *are* short Gorilla Technology Inc., ('GRRR', 'Gorilla', 'the Company') because we think Gorilla is the most ridiculous fraud we've written about publicly to date" (Ex. 1 at 2); and (b) "[w]e are short and believe shares are headed far lower" (*id*. at 6) (emphasis added); *see also* ¶¶18, 20 (acknowledging disclosure of Defendants' short selling). This contradicts the Complaint's claim "on information and belief" that Defendants took a short position "shortly after publishing" the Report.  ¶27.

complains could not have been understood by a reasonable reader as assertions of fact that were proffered for their accuracy").

The Complaint also focuses on Defendants' colorful language regarding Gorilla in a X (formerly Twitter) post introducing the Report.  *See* ¶20 ("We are short Gorilla Technology Inc $GRRR - the most ridiculous fraud we've written about: fake products, fabricated deals, fraudulent partners, fictitious offices, and phony financials. We think $GRRR should be halted and delisted."); *see also* ¶28 (Gorilla has "fake products").  This colorful language does not strip Defendants' opinions of their constitutional protection.  *See, e.g., Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (1st Dep't 1999) ("loose, figurative or hyperbolic statements, even if deprecating the plaintiff, are not actionable," and "[c]ourts will not strain to find defamation where none exists") (citation omitted); *Ganske v. Mensch*, 480 F. Supp. 3d 542, 553-54 (S.D.N.Y. 2020) (collecting cases demonstrating that hyperbole and fiery rhetoric are not actionable defamation, and examining a Twitter post and observing that "'New York courts have consistently protected statements made in online forums as statements of opinion rather than fact.'"), quoting *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 295 (E.D.N.Y. 2015).

### b.  The Challenged Statements Disclose the Facts on Which They Are Based, None of Which are Alleged to be False, and Therefore Are Pure Opinion

The Report meticulously sets forth the specific factual basis for each opinion, rendering each of them inactionable "pure opinion."  *Steinhilber*, 68 N.Y.2d at 289 ("A 'pure opinion' is a statement of opinion which is accompanied by a recitation of the facts upon which it is based."). Such opinions are afforded absolute protection and cannot form the basis of a claim for libel or defamation.  *See, e.g*., *Cassava Scis., Inc. v. Bred*t, 2024 WL 555484, at *10 (S.D.N.Y. Jan. 3, 2024), *report and recommendation adopted*, 2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) (dismissing defamation claims against shortsellers where their targeted statements were

10

accompanied by a recitation of the facts on which they were based and therefore nonactionable

opinion); *Eros Int'l, PLC v. Mangrove Partners*, 140 N.Y.S.3d 518, 519 (App Div. 1st Dep't

2021) (shortseller's "statements were accompanied by a recitation of facts on which they were

based and therefore were nonactionable opinion"); *Silvercorp Metals Inc.*, 2012 WL 3569952 at

*9 (shortseller's statements were non-actionable, constitutionally protected "pure opinion" not

"based upon undisclosed facts" but instead they "were derived from data accessible by the

provided hyperlink, giving readers the opportunity to review the underlying facts and form their

own conclusions").

### i. Disclosed Facts Supporting Opinion on $1.8 Billion Signed Contract

The Complaint takes issue with the Report's critical opinions of Gorilla's purported

'$1.8B signed contract with the Provincial Electricity Authority ("PEA") of Thailand, the

nation's electricity authority, and Culper's statement that Gorilla's CEO Jay Chandan 'insists

this a signed contract.'"  ¶37; *see* Ex. 1 at 10 (quoting Gorilla CEO).

The Report identifies the following unchallenged factual bases for this opinion which are

disclosed in the Report in connection with the opinion:

- the supposed $1.8 billion contract was not disclosed publicly in Thai databases, despite Thai law requiring public disclosure of awards over $60,000 USD;

- Culper spoke directly with the Assistant Manager of the Thailand's Electricity Authority's Smart Grid Division who stated unequivocally that no such contract exists, and certainly not for $1.8 billion." Ex. 1 at 3, 10-11.  Screenshots of this conversation, as well as the employee's LinkedIn page, are pasted into the text of the Report.

- Thailand's public disclosures never once mention Gorilla, nor were there any other public RFPs, contract award announcements, or similar disclosures that one might expect to see for such a reportedly massive contract. (*Id*. at 10, hyperlinking to Thailand's Provincial Electricity Authority website).

- Culper commissioned a Thailand law firm to investigate the deal, hoping to find more details about, for example, implementation timelines, additional partners on the deal, or more broadly, any shred of evidence that the deal actually exists. The Report pastes

the response:  "We have not found other Thai publication or media reporting on the investment deal, including any mention of an amount of 1.8 billion USD or less between the Company and any Thai entity in specify [sic] . . .'"  *Id.* at 11.

Critically, the Complaint fails to allege the falsity of any of these underlying facts or the opinion.  This pleading failure is fatal.  *See, e.g.*, *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) ("Because falsity is an element of New York's defamation tort, and 'falsity' refers to material not substantially true, the complaint in this case must plead facts that, if proven, would establish that the defendant's statements were not substantially true."); *Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.*, 2020 WL 6323462, at *3 (S.D.N.Y. Oct. 28, 2020) (dismissing defamation claim because plaintiff "identifies no statement in this letter that is explicitly false"); *Soter Techs., LLC v. IP Video Corp.*, 523 F. Supp. 3d 389, 410 (S.D.N.Y. 2021) ("'To state a claim for trade libel, a plaintiff must adequately plead '[] falsity of the statement'") (citation omitted).

Indeed, nowhere does the Complaint dispute that Gorilla and its CEO falsely stated there was a *signed* contract with the Thailand Electricity Authority—nor can it, as the Report sets forth all of the public statements Gorilla's CEO made calling this arrangement a signed contract.[7] Gorilla ignores what its CEO publicly stated, and instead dubiously extolls as "demonstrably accurate" a separate company press release which refers to an "agreement" with the Thailand

_____

[7] *See* Ex. 1 at 2 (On March 5, 2025, Gorilla claimed to have *signed* a 15-year, $1.8 billion deal with Thailand's Provincial Electricity Authority ("PEA") for "smart grid and AI-powered energy transformation" services. Five days later, Gorilla announced the "formal launch of the initial phases" of the initiative. Chandan insists this is a "*signed contract*" and even comes with a 10% ($180 million) prepayment." (emphasis added); *Id.* at 9 (quoting Gorilla CEO). "So yes, *we have nearly $2 billion plus in signed contracts*, or contracts won to-date. These are not theoretical. They are structured commercial agreements with detailed scope, phased delivery schedules and monetization milestones. ... And yet here is the question we keep hearing, especially from skeptics and other naysayers . . . How is Gorilla *signing* multibillion dollar deals? How are we building a $6 billion pipeline? Is that even real?") (emphasis added).

Electricity Authority.  ¶38.  Gorilla concedes the accuracy of the Report's opinions by now

backtracking on these statements, admitting that Gorilla has only ever had a memorandum of

understanding ("MOU") with the Thai Electric Authority.  *Id*.  Specifically, Gorilla now claims

that the use of the word "agreement," rather than "contract," in this press release—issued prior to

its numerous subsequent references to being a "signed contract"—somehow signaled that the

deal was not a signed agreement or contract, but only a MOU "to cooperate in exploring how

Gorilla can fulfill Thailand's unmet demand for technology solutions that address Thailand's

critical infrastructure and digital development priorities."  *Id*.  The Complaint itself contradicts

this illusive agreement/contract distinction by referring elsewhere to the alleged $1.8 billion deal

as "one of the Company's most significant ***contracts***."  ¶37 (emphasis added).  The Complaint

also ignores that a MOU "to cooperate in exploring" a possible future deal is a far cry from a

signed contract that Plaintiff claimed was even accompanied by pre-payments.[8]

### ii.  Disclosed Facts Supporting Opinion on Thai Police Contract

The Complaint alleges that the "Culper Report Falsely Claims $50-60 Million Deal with

Thai Tourist Police Worth Just $20,000-30,000."  ¶39 (heading).  The Report specifies the

following unchallenged factual bases for this opinion:

- the alleged contract was not publicly disclosed in any Thai databases as required by
  law, with a hyperlink to the Tourist Police Bureau website. Under Thai law,
  government procurement of any supplies or services that exceed 2 million baht – or
  roughly $60,000 USD – <u>must be published</u> publicly and electronically (with a
  hyperlink to the law set forth in the Report).  Indeed, the Report demonstrates that the
  Thai Tourist Police regularly announces deals for even the most trivial services such
  as <u>office cleaning</u> (hyperlinking to such disclosure in December 2024) and <u>office</u>
  <u>supplies</u> (hyperlinking to such disclosure in January 2025). The Report notes that the

---

[8] Indeed, this new revelation that the "signed contract" was really just a MOU simply cannot be
reconciled with Gorilla's CEO's prior claim that the PEA had already advanced $180 million on
the $1.8 B contract.  *See* Ex. 1 at 2, 10.  It is not plausible that a customer would advance $180
million to Gorilla without a signed contract.

Thai Tourist Police has never once mentioned Gorilla in any of its public tender offers or procurement announcements. *See* Ex. 1 at 11.

- Culper notes that its sources spoke directly with the Thai Tourist Police who stated that he suspects the deal actually consists of just 100 to 150 cameras at $200 per camera, or a total purchase price of $20,000 to $30,000 USD – just 0.05% of what CEO Chandan claims. As the Report states, "This figure also explains why the deal is not listed publicly, as it falls below the $60,000 disclosure threshold." *Id*. at 3.

- Gorilla suspiciously formed a Thai subsidiary just a week before the deal announcement with just ~$88,000 USD in capital, with a screenshot of the company formation information pasted into the Report. *Id*. at 12-13.

- a Thai-based law firm commissioned by Culper found no evidence of such contract. *Id*. at 4.

The Complaint does *not* dispute any of Culper's disclosed facts underlying the Report's opinions. Moreover, it does not allege that any of these disclosed facts, or Culper's actual statements, are false. *Tannerite Sports*, 864 F.3d at 247; *Garfinkle*, 2020 WL 6323462, at *3. Instead, the Complaint claims that the cost of the cameras does not "equate" to the "total value of a strategic, multi-year engagement with a major law enforcement agency." ¶40. Notably, however, the Complaint's own allegations betray Plaintiff's own misrepresentations that a $50-$60 million deal ever existed. *Id.* (noting "Gorilla ***has planned*** for a phased national roll-out, accounting for budget cycles, and adjustments for outcome-linked market performance indicators") (emphasis added); ¶41 ("The ***estimated value*** of this partnership factored in a multi-phase, multi-year engagement ***wherein Gorilla intends to be*** a long-term partner throughout the orchestration, management, innovation, and compliance stages.") (emphasis added). The Complaint then claims Defendants' estimates of value of the  deal are "inherently and obviously

14

unreasonable" yet Plaintiffs themselves never provide an actual value for the supposed deal or

any factual basis for this claim beyond bald assertion of its own "estimates." ¶42.[9]

### iii. Disclosed Facts Supporting Opinion on Gorilla Hardware

Lastly, the Report specifies the following factual support for Defendants' opinion that

"[w]e think Gorilla's technological abilities are practically non-existent":

- The Report lays out Defendants' "simple reverse image search [which] reveals
  that Gorilla has merely slapped its own logo on top of old Dell desktop PCs and
  Telpo cameras, readily available for purchase on eBay or any number of online
  retailers for a few hundred dollars." Specifically, as the Report sets forth,
  "Gorilla appears to instead sell commoditized hardware that the Company doesn't
  even manufacture itself. For example, Gorilla claims to offer what it calls "Video
  Analytics AI hardware" as shown below," with a hyperlink to Gorilla's website.
  The Report then pastes in a side-by-side comparison of the product on Gorilla's
  website against an Amazon page for a standard Dell desktop PC.

 

- The Report also demonstrates that Gorilla's hardware was not in fact Gorilla's
  proprietary "AI Hardware" but instead was standard, commoditized desktop PCs and
  cameras onto which Gorilla had replaced the manufacturers logo with its own. The
  Report pastes in a comparison of a Gorilla product from its website against a picture
  of a Telpo camera and a Dell desktop PC which can each be ordered from a number
  of online retailers.

---

[9] Plaintiff also cites the Report's statements regarding the Thai Tourist Police deal out of context.
The Report specifically identifies the sources on which it relied for its opinion that the deal was
worth only $25,000 to $30,000. *See* Ex. 1 at 3, 11. The Complaint does not challenge the
veracity of any of these corroborating facts unearthed by Defendants' investigation.



Ex. 1 at 8.

  The Complaint nowhere refutes that Gorilla in fact engages in these practices, nor offers any facts to demonstrate the falsity of these statements or underlying facts. *Tannerite Sports*, 864 F.3d at 247; *Garfinkle*, 2020 WL 6323462, at *3. Instead, Plaintiff confirms these practices, then attempts to justify them, *i.e.* arguing that "the inherent value Gorilla provides is in its proprietary **software**" and that Culper was "reckless" in choosing to critique Gorilla's purported "AI Hardware." ¶¶30, 32.[10] The Complaint further alleges that Defendants "equate using commercial off-the-shelf hardware with fraud." ¶30. Neither that statement nor that notion, however, is contained in the Report, which instead takes issue only with Gorilla's misrepresentations about its proprietary hardware capabilities, as noted above.

---

[10] Ironically, the Complaint contradicts this claim by crediting the Culper Report for accurately quoting Gorilla's 2023 Form 20-F extolling the value of Gorilla's proprietary software "in edge AI computing, video analytics, and OT security solutions." ¶31.

Because Plaintiff's claims are based entirely on the foregoing opinions—the factual support for which was fully disclosed in the Report— and because the Complaint fails to plausibly plead that any alleged defamatory statements are false, Plaintiff has failed to allege any actionable defamatory statements.

## II.    PLAINTIFF HAS NOT PLAUSIBLY ALLEGED DEFENDANTS PUBLISHED THE STATEMENTS WITH ACTUAL MALICE

As a company whose stock is traded publicly on the NASDAQ exchange, Gorilla is a "public figure" under the First Amendment and is therefore required to plead that Defendants acted with "actual malice" toward it to state a viable claim for defamation and libel. *See New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); *MiMedx Grp.,* 2018 WL 847014, at *6 (plaintiff public company "must demonstrate that the defendant acted with 'actual malice' in connection with the defamatory statements.").  New York's anti-SLAPP law, which applies to suits like this one that target "lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest," N.Y. Civ. Rights Law § 76-a(1)(a)(2), also imposes an actual malice standard.  *See Heilbut v. Cassava Sciences, Inc.*, 2025 WL 919654, at *8 (S.D.N.Y. Mar. 26, 2025) (applying New York's anti-SLAPP law to short sellers accused of defamation for criticism of a public company); *Palin v. New York Times Co*., 510 F. Supp. 3d 21, 26 (S.D.N.Y. 2020) (Rakoff, J.) ("federal court sitting in diversity must apply [N.Y. Civ. Rights Law] § 76-a because it is a substantive, rather than a procedural, provision"); *Bloom*, 735 F. Supp. 3d at 477 (Rakoff, J.) (same).

"Importantly, actual malice does not simply connote ill will or spite; rather it is 'a term of art denoting deliberate or reckless falsification.'"  *Biro,* 963 F. Supp. 2d at 276, quoting *Masson v. New Yorker Magazine*, 501 U.S. 496, 499 (1991).  "[T]he operative question is whether a defendant failed to investigate in the face of 'actual, subjective doubts as to the accuracy of the

17

story.'"  *Id.*, quoting *Stern v. Cosby*, 645 F. Supp. 2d 258, 284 (S.D.N.Y.2009).  The Complaint

must therefore allege specific "facts that, if proven true, could plausibly show that the

[Defendants] actually possessed a 'high degree of awareness of [the statements'] probable

falsity.'"  *1st Amend. Praetorian v. New York Times Co*., 2025 WL 949575, at *10 (S.D.N.Y.

Mar. 28, 2025), quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964); *BYD Co. Ltd. v. VICE

Media LLC*, 531 F. Supp. 3d 810, 826–27 (S.D.N.Y. 2021) (dismissing defamation claim for

failure to plead actual malice because "[n]one of the facts in the Complaint allege that

[Defendant] had 'obvious reasons' to doubt the veracity of [its report] prior to publishing or that

it possessed information that should have put it on notice as to the veracity of the report"), *aff'd*,

2022 WL 598973 (2d Cir. Mar. 1, 2022) (citations omitted).

       Courts have described this pleading standard for actual malice as "a high bar."

*McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 185 (S.D.N.Y. 2020); *Biro*, 963 F.

Supp. at 278 ("'proving actual malice'" is not only "'a heavy burden,' but, in the era of *Iqbal* and

*Twombly*, pleading actual malice is a more onerous task as well.") (citation omitted).  In this

case, Gorilla's Complaint falls far short of clearing that hurdle.

       First, the Complaint attempts to plead actual malice by claiming that Defendants "took no

steps to confirm the accuracy with *Gorilla* prior to publication."  ¶25.  That allegation is not

remotely sufficient to allege actual malice.  *See Freeman v. Johnston*, 84 N.Y.2d 52, 58 (1994)

(alleged failure to investigate alone, including by conducting additional interviews, will not

support a finding of actual malice); *Bloom*, 735 F. Supp. 3d at 474 ("in general a failure to

investigate in and of itself is insufficient to show actual malice") (Rakoff, J.), *citing Harte-Hanks

Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) ("[F]ailure to investigate before

publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard.").

Next, the Complaint alleges that Defendants "recklessly" relied on pictures of the exterior of Gorilla's hardware to make "sweeping" statements about Gorilla's products (¶29) because Gorilla's Form 20-F allegedly makes clear that the "inherent value" in Gorilla's products is the software – *i.e.*, its computing, analytics and processing capabilities (¶¶31-33). These deficient allegations do nothing to show that Defendants had a high degree of awareness that their statements were probably false because, as noted above, the allegations totally ignore that Defendants' claims were about Gorilla's unchallenged misstatements about what Gorilla itself referred to as "AI hardware," which the pictures demonstrated were false.

Similarly, the Complaint's claim that Gorilla's press release demonstrates that the Thai Electricity Authority transaction was an "agreement" not a "contract" (¶38) also fails because the Report takes issue with Gorilla's CEO and CFO's own repeated statements that referred to the agreement as a "***signed*** contract." Thus, Gorilla's claim that some previous company statement, which less definitively described that contract, does nothing to show that Defendants relied on Gorilla's more recent and more definitive public statements in bad faith.

The Complaint's conclusory claim that the Report's valuation of Gorilla's Thai Police deal at $25,000 "is inherently and obviously unreasonable" (¶42) also falls far short because the Complaint fails to state the actual value of the that deal against which to measure the reasonableness of the Report's statement, and such conclusory allegations that Defendants acted "unreasonably," "willfully," "intentionally," or "with reckless disregard for the truth" (¶¶28, 29, 31, 32, 42, 50, 52 and 59) do not satisfy the requirement of alleging specific facts to support a plausible inference of actual malice. *See, e.g., Biro*, 963 F. Supp. 2d at 280 (conclusory

19

allegations that defendant acted knowingly, recklessly, or maliciously are inadequate to allege actual malice).

Lastly, Plaintiff's claim that "publicly available information" made clear that the statements in the report are false (¶52) also falls far short of pleading actual malice because it provides no "specific facts" to support such a conclusory allegation.  The only publicly available information the Complaint cites is a press release and Gorilla's 2023 Form 20-F, neither of which address the specific claims Defendants made regarding Gorilla's CEO's claim of a "**signed**" $1.8 billion "contract" or Gorilla's claim that it had "proprietary AI Hardware."

Because none of these allegations come close to satisfying the high bar for pleading actual malice by alleging "specific 'facts that, if proven true, could plausibly show that the [Defendants] actually possessed a 'high degree of awareness of [the statements'] probable falsity,'" *1st Amend. Praetorian*, 2025 WL 949575, at *10, Plaintiff's claims must be dismissed.[11]

### III.    PLAINTIFF'S TRADE LIBEL CLAIM MUST BE DISMISSED FOR FAILURE TO ALLEGE THE REQUIRED SPECIAL DAMAGES

In addition to the fatal deficiencies noted above,[12] Plaintiff's trade libel claim must also be dismissed for failure to allege the required special damages.  *See Soter Techs., LLC,* 523 F.

---

[11] The Complaint's observation that Defendants were short sellers motivated by profit is also beside the point.  *See* ¶¶5, 22.  "[A] desire to turn a profit does not in and of itself indicate a defendant acted with actual malice."  *Bloom*, 735 F. Supp. 3d at 474-475 (Rakoff, J.), citing *Harte-Hanks Commc'ns*, 491 U.S. at 667; *MiMedx Grp.,* 2018 WL 4735717, at *12 (short seller's "financial motive – standing alone – does not support a finding of actual malice").

[12] As demonstrated in Points I and II above, Plaintiff's trade libel cause of action must also be dismissed for failure to adequately allege falsity and actual malice and because the cause of action relies on inactionable and constitutionally protected opinion.  *See Soter Techs., LLC*, 523 F. Supp. 3d at 410. ("To state a claim for trade libel, a plaintiff must adequately plead '(1) falsity of the statement, (2) publication to a third person, (3) malice (express or implied), and (4) special damages.'") (citation omitted); *Celle*, 209 F.3d at 178 (statements of opinion are entitled to "absolute" protection).

Supp. 3d at 410 ("Whether a plaintiff has suffered special damages 'goes to the cause of an

action itself ... Courts considering product disparagement claims have therefore applied this

requirement strictly, granting motions to dismiss ... for failure to allege special damages with the

requisite specificity.'").  To adequately allege trade libel, "the plaintiff must show that the

defendant published an oral, defamatory statement directed at *the quality of a business's goods*."

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002), citing

*Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670 (1981) (product defamation "is

confined to statements denigrating the quality of the business' goods or services" not which

"impugn[] the basic integrity or creditworthiness of a business.").

In order to allege special damages to justify a trade libel claim, a plaintiff "must clear

several hurdles."  *Soter Techs., LLC,* 523 F. Supp. 3d at 410.  "First, special damages are 'limited

to losses having pecuniary or economic value, and must be fully and accurately stated, with

sufficient particularity to identify actual losses.'"  *Id.*, quoting *Enigma Software Grp. USA, LLC

v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 292 (S.D.N.Y. 2016) (quoting *Kirby v.

Wildenstein*, 784 F. Supp. 1112, 1116 (S.D.N.Y. 1992)).  Additionally, "'special damages must

be the 'natural and immediate consequence of the disparaging statements' to be recoverable.'"

*Id.*, quoting *Kirby*, 784 F. Supp. at 1116 (quoting *Angio–Med. Corp. v. Eli Lilly & Co.,* 720 F.

Supp. 269, 274 (S.D.N.Y. 1989)); *Cambridge Assoc. v. Inland Vale Farm Co.*, 116 A.D.2d 684,

497 N.Y.S.2d 751, 753 (2d Dept. 1986) (special damages must be "related causally to the alleged

tortious acts").  "[I]f the special damage was a loss of customers ... if they are not named, no

cause of action is stated."  *Enigma Software Grp.*, 194 F. Supp. 3d at 292 (citation omitted).

The Complaint fails to clear these hurdles.  The Complaint's allegation that Gorilla's

stock price dropped as a result of the publication of the Culper Report (¶43) is plainly

inadequate.  *See NOVAGOLD Res., Inc. v. J Cap. Rsch. USA LLC*, 2022 WL 900604, at *11 (E.D.N.Y. Mar. 28, 2022) (alleging decline in stock price in alleged reaction to publication of short seller report insufficient to allege special damages for trade libel).  This is especially so where, as here, the Complaint makes no attempt even to demonstrate that Gorilla's stock price moved because of the lone statement in the Report that disparaged Gorilla's products rather than because of the Report's many other damning opinions about Gorilla's accounting irregularities. *Kirby*, 784 F. Supp. at 1116 ("special damages must be the 'natural and immediate consequence of the disparaging statements'"); *Fendi USA, Inc.*, 314 F.3d 48, 59 (trade libel must allege disparagement of products not integrity of business).

Equally deficient are the Complaint's allegations that (a) Gorilla lost an *unnamed* institutional investor, who supposedly "explicitly cited the Culper Report as its basis for withdrawing from discussions" (¶46) and (b) Gorilla was told by another unnamed investment firm that Gorilla's access to $200 million in capital would be delayed for two weeks because the Culper Report triggered an accounting review delaying the issuance of Gorilla's audited financial statements (¶44).  The Complaint fails to identify these entities by name or to allege plausible facts demonstrating that the allegedly defamatory statements about Gorilla's products, as opposed to the many other damning statements in the Report, actually caused these supposed damages.  Those deficiencies are fatal to the trade libel claim.  *See, e.g. Drug Rsch. Corp. v. Curtis Pub. Co.*, 7 N.Y.2d 435, 440–41 (1960) ("'special damage must be fully and accurately stated; if the special damage was a loss of customers, . . . the persons who ceased to be customers, or who refused to purchase, must be named'") (citation omitted); *Eminah Props. LLC v. Energizer Holdings, Inc.*, 531 F. Supp. 3d 593, 608 (E.D.N.Y. 2021) ("[S]pecial damages . . . must be fully and accurately stated, with sufficient particularity to identify actual losses" and

"'must be the natural and immediate consequence of the disparaging statements to be recoverable.'"), quoting *Soter Techs., LLC v. IP Video* Corp., 2021 WL 744511, at *13 (S.D.N.Y. Feb. 26, 2021).[13]

## IV.    DEFENDANTS ARE ENTITLED TO ATTORNEY'S FEES UNDER NEW YORK'S ANTI-SLAPP STATUTE

New York's anti-SLAPP statute provides Defendants a right to recover attorney's fees from Plaintiff where, as here, an "action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law."  N.Y. Civ. Rights Law § 70-a(1).  This provision of New York's anti-SLAPP law is substantive and therefore applies before this Court.  *See Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 183 (S.D.N.Y. 2024) (applying mandatory attorney's fee provision of New York's anti-SLAPP law as "substantive"); *see also, e.g., Cotton v. Slone,* 4 F.3d 176, 180 (2d Cir. 1993) ("Attorney's fees mandated by state statute are available when a federal court sits in diversity."); *Adelson*, 774 F.3d 803, 809 (2d Cir. 2014) (Nevada's anti-SLAPP statute's  mandatory fee shifting is substantive and therefore "unproblematic" and applicable in federal court); *but see Carroll v. Trump*, 590 F. Supp. 3d 575, 585 (S.D.N.Y. 2022) (declining to apply Section 70-a of the New York anti-SLAPP statute for attorney's fees because it conflicts with federal procedure).

---

[13] The Complaint's claim that Gorilla incurred $168,000 in legal fees and professional services "to combat the misrepresentations and panic created by the Culper Report" (¶45) is also inadequate.  The Complaint fails to specify what firms incurred these fees and makes no effort to explain why their work was necessitated by the lone statement Gorilla identifies in the Report that allegedly disparaged Gorilla's products – i.e., its AI Hardware -- rather than the Report's many other damning claims detailing Gorilla's material misconduct.  Thus, the Complaint fails to allege that these costs were "the natural and immediate consequence of the disparaging statements." *Eminah Props.*, 531 F. Supp. 3d at 608.

Defendants have demonstrated above that Gorilla's lawsuit is "without a substantial basis in fact and law" and can "not be supported by a substantial argument for the extension, modification or reversal of existing law."  N.Y. Civ. Rights Law § 70-a(1).  Thus, if the Court grants Defendants' motion to dismiss, Defendants respectfully request permission to submit their attorney's fees and costs incurred in defending this action so that the Court may order Gorilla to pay them.

**CONCLUSION**

For the foregoing reasons the Court should dismiss the entire Complaint with prejudice and grant Defendants permission to file a motion for attorney's fees and costs.

Dated: May 22, 2025

**FLEISCHMAN BONNER & ROCCO LLP**

/s/
Patrick L. Rocco
Tyler E. Van Put
445 Hamilton Ave., Suite 402
White Plains, New York 10601
Tel:     (914) 278-5100
Fax:     (917) 591-5245
Email:  procco@fbrllp.com
           tvanput@fbrllp.com

*Counsel for Defendants Shadyside Partners, LLC and Christian Lamarco*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of May 2025, a true and correct copy of the foregoing MEMORANDUM OF LAW OF DEFENDANTS SHADYSIDE PARTNERS, LLC AND CHRISTIAN LAMARCO IN SUPPORT OF THEIR MOTION TO DISMISS was filed with the Court through the electronic filing system, which will automatically serve electronic notice of the same on all counsel of record.

/s/ Patrick L. Rocco
Patrick L. Rocco