**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GORILLA TECHNOLOGY GROUP, INC.<br><br>Plaintiff,<br><br>-against-<br><br>SHADYSIDE PARTNERS, LLC *DBA* CULPER RESEARCH and CHRISTIAN LAMARCO,<br><br>Defendants. | **ECF CASE**<br><br>**Case No. 1:25-cv-03142-JSR**<br><br>**<u>ORAL ARGUMENT REQUESTED</u>** |

# SUPPLEMENTAL MEMORANDUM OF LAW OF DEFENDANTS SHADYSIDE PARTNERS, LLC AND CHRISTIAN LAMARCO IN SUPPORT OF THEIR MOTION TO DISMISS

Patrick L. Rocco
Tyler E. Van Put
FLEISCHMAN BONNER & ROCCO LLP
445 Hamilton Ave., Suite 402
White Plains, New York 10601
Tel: (914) 278-5100
Fax: (917) 591-5245
Email: procco@fbrllp.com
tvanput@fbrllp.com

*Counsel for Defendants Shadyside Partners, LLC and Christian Lamarco*

Dated: June 5, 2025

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT .......................................................................................................... 2

I. Plaintiff's Amended Complaint Fails to Salvage the Pleading Deficiencies as to the Allegedly Defamatory Statements Raised in the Original Complaint…………......... 2

A. The AC's Additional Allegations do not Cure the Pleading Deficiencies as to Defendants' Statements Regarding Gorilla's Claims About its AI Hardware .....2

B. The AC's Additional Allegations do not Cure the Pleading Deficiencies as to Defendants' Statements Regarding Gorilla's False Claim About a $1.8B "Signed Contract" with Thailand's Provincial Electricity Authority ..................4

C. The AC's Additional Allegations do not Cure the Pleading Deficiencies as to Defendants' Statements About Gorilla's Claims About the Royal Thai Tourist Police Contract...........................................................................................6

II. The AC Fails to Plead Defamation as to the New Allegedly Defamatory Statements……………………………………………………...………......... 7

A. The AC Still Fails to Allege that the Report's Statements Regarding Global Edge Fund and ONE Amazon are Actionable Defamation .................................7

B. The AC Fails to Allege that the Report's Statements Regarding Revenue Reporting From Egyptian Government Project Are Actionable Defamation.....10

C. The AC Fails to Allege that the Report's Statements Regarding Gorilla's Reporting of Accounts Receivables are Actionable Defamation .......................12

D. The AC Fails to Allege that the Report's Statements Regarding Gorilla Related Party Transactions are Actionable Defamation .................................................13

III. The AC Continues to Fail to Plead Actual Malice……………...………......... .........15

CONCLUSION ...................................................................................................... 15

## TABLE OF AUTHORITIES

**Case** **Page(s)**

*Freeman v. Johnston,*
84 N.Y.2d 52 (1994)……………………………..…………………………… 14

**Rule / Statute** **Page(s)**

Fed. R Civ. P. 12(b)(6)……………………………………………………………….. 1

Defendants respectfully submit this Supplemental Memorandum of Law in support of their motion to dismiss with prejudice Gorilla's Amended Complaint pursuant to Fed. R Civ. P. 12(b)(6).[1]

## PRELIMINARY STATEMENT

Despite more than doubling the size of the original Complaint, the allegations in the Amended Complaint ("AC") do nothing to save Plaintiff's claims. Indeed, Plaintiff's additions provide further support for Defendants' arguments for dismissal: the challenged statements in the Report are non-actionable pure opinions; Plaintiff has not adequately alleged actual malice; Plaintiff has failed to allege that any of the Report's challenged statements, or the disclosed facts on which they are based, are false; and Plaintiff has failed to allege the special damages required to plead trade libel. Mem. at 3-5, 10-11, 14, 17-23.

The AC also fails to address a striking fact: Gorilla's stock price had already plummeted from $44.15 to $18.99 per share – a 57% decline – prior to the Report's publication, whereas the fluctuation following the Report's publication was approximately $2 a share—dramatically less.[2] The idea, as alleged, that Gorilla's troubles were necessarily caused by the Report is simply implausible given that Gorilla's stock price had already fallen 57% from its peak *before* the public ever saw the statements Gorilla now challenges as defamatory.

---

[1] This supplement uses the same abbreviations, defined terms and citation formats as the May 22, 2025 Memorandum of Law of Defendants Shadyside Partners, LLC and Christian Lamarco in Support of Their Motion to Dismiss ("Mem.," ECF Doc. #17), except that citations to "¶ __" now refer to specific paragraphs of the AC (ECF # 20) and "Ex. 1" now refers to the Culper Report attached as Exhibit 1 to the AC. Because Exhibit 1 does not contain the active hyperlinks that were provided in the Report as published, we provide the following link which contains the Report with those links: https://img1.wsimg.com/blobby/go/cc91fda7-4669-4d1b-81ce-a0b8d77f25ab/downloads/4cb772a4-73d8-4642-9c53-84f7f9c4ecba/Culper_GRRR_4-4-2025.pdf?ver=1747746606164

[2] *See* https://www.nasdaq.com/market-activity/stocks/grrr.

Moreover, Plaintiff concedes by its silence the accuracy of the Report's remaining opinions that (a) Gorilla misrepresented its $20M annual partnership with Boston-based "BroadSat" (Ex. 1 at 21-22); (b) Gorilla misrepresented the ongoing construction of 20+ data centers in Egypt and internationally (which never happened) (*Id*. at 22-25); and (c) Gorilla misrepresented that it was opening a "US hub" office. *Id*. at 20-21*;see also* Mem. at 5. The AC finally fails to challenge the Report's concerns regarding Gorilla's change of auditors and the work history of Gorilla's former CFO, who had also previously served as CFO of Lihua International, whose stock collapsed, and whose CEO was detained after finding Lihua had hidden a mountain of debt. *Id.*; Ex. 1 at 24-27.

## ARGUMENT

### I. Plaintiff's Amended Complaint Fails to Salvage the Pleading Deficiencies as to the Allegedly Defamatory Statements Raised in the Original Complaint

#### A. The AC's Additional Allegations do not Cure the Pleading Deficiencies as to Defendants' Statements Regarding Gorilla's Claims About its AI Hardware

Plaintiff adds several paragraphs to the AC trying to bolster its baseless claim that Defendants defamed Gorilla by criticizing Gorilla's supposed proprietary "AI Hardware." *See* Ex. 1 at 4 ("Gorilla and its CEO Jay Chandan now promote the Company as a 'dominant' provider of "'AI hardware'"). As an initial matter, Plaintiff does not dispute that these statements, taken in their context, are opinion. Moreover, these new allegations still suffer from the same flaw Defendants pointed out in their original Motion to Dismiss: Plaintiff continues to allege that Gorilla's value is in its proprietary *software*, *see, e.g.*, ¶37 ("Gorilla's AI appliances integrate proprietary software"). But, as Defendants already made clear, the Report *expressly acknowledges* and *never disputes* this. *See* Mem. at 16, fn. 10; ¶39 (noting the Report quotes Gorilla's 2023 Form 20-F extolling Gorilla's software technologies "in edge AI computing video analytics and OT security solutions").

Plaintiff's claim fails because the Report makes a different point that the AC fails to engage—it takes issue with Gorilla's *hardware offerings*. The distinction between hardware and software is universally known. The Report clearly notes Gorilla does not manufacture its own "AI hardware"—a point Plaintiff does not dispute in either version of its pleading. Indeed, Gorilla now admits that it instead obtains "pre-qualified hardware" (from partners like Dell and Telpo – as accurately identified in the Report). ¶36. This new allegation only confirms that the statements are not actionable defamation: they are opinions replete with disclosed supporting facts, none of which Gorilla can meaningfully allege are false; nor is there a plausible allegation that Defendants acted with actual malice in publishing these opinions. Mem. at 15-20.

Unable to demonstrate the falsity of any of the Report's statements, the AC consistently misstates and mischaracterizes the Report's statements and then knocks down those straw men. For example, the AC falsely alleges that the Report claims that Gorilla "is merely selling rebranded hardware from other manufacturers and passing it off as Gorilla's *technology*." ¶33 (emphasis added). But the Report never says that. Rather, the Report supports its opinion that Gorilla's *AI Hardware* is "fake" by accurately pointing out that, contrary to CEO Chandan's claims, Gorilla in fact does not manufacture *any* hardware, but merely rebrands third party hardware as its own. Ex. 1 at 8 ("Gorilla appears to instead sell commoditized hardware that the Company doesn't even manufacture itself," "Gorilla's AI Hardware is an old Dell desktop"). Similarly, after citing to all the software enhancements Gorilla allegedly provides, the AC claims that the Report "concluded that Gorilla's products are simply counterfeit knockoffs without any functionality or value from the predicate hardware." ¶45. Again, the Report *never* claims that Gorilla's hardware "are counterfeited knockoffs." Rather, it opines that—contrary to Plaintiff's representations—Gorilla does *not* manufacture its own proprietary hardware. Ex. 1 at 8.

The AC also accuses Defendants of taking Gorilla's AI hardware claims out of context while ignoring other disclosures about that hardware. ¶41. The AC concedes, however, that the Report provides a link to the very website that Plaintiff claims provides this proper context. ¶41; Ex. 1 at 8. This defeats Plaintiff's claim – indeed its inclusion demonstrates that the Report fully disclosed the basis for Defendants' opinion and linked to that basis so that readers can draw their own conclusions therefrom. More importantly, the website statements that Plaintiff now misquotes still do *not* support Chandan's false claim that Gorilla manufactures its own propriety AI hardware. Gorilla's website states only that its hardware "is enabled with Gorilla's proprietary technology." *Id.* The AC also falsely claims that Gorilla's "***product description states Gorilla has converted the [hardware] device into*** 'a contactless AI Appliance.'" ¶43 (emphasis added). But this is more Gorilla doublespeak—the website does not contain any disclosures stating that any hardware was "*converted*" from anything, nor does it include any of the above bolded language. ¶43, n.6.

### B. The AC's Additional Allegations do not Cure the Pleading Deficiencies as to Defendants' Statements Regarding Gorilla's False Claim About a $1.8B "Signed Contract" with Thailand's Provincial Electricity Authority

The AC's additional allegations regarding Chandan's claims that Gorilla had a "signed contract" for $1.8 billion with the Thailand's Provincial Electricity Authority ("PEA") again rely only on the Report's non-actionable opinions and fail to demonstrate the falsity of any of those opinions or the fully disclosed facts on which they are based. *See* Mem. at 11-13. Moreover, forced to concede that Gorilla never had the $1.8 billion "signed contract" that CEO Chandan and CFO Bower had previously claimed[3], the AC resorts to distorting Gorilla's own statements

[3] CFO Bruce Bower, March 31, 2025 earnings call: "It's a similar situation with -- in Thailand with the PEA, the smart electricity grid. We know that, that's a mammoth contract." Chandan, same call: "So yes, we have nearly $2 billion plus in signed contracts, or contracts won to-date.

and the Report's criticism of them in a half-hearted attempt to suggest that Chandan and Bower did not actually say what they (most definitely) said. For example, the AC claims that Chandan's statements of $2 billion in "signed contracts" on the March 31, 2025 earnings call "were not explicitly about Thailand let alone the agreement with the PEA," suggesting they therefore could not have been a reference to the $1.8 billion PEA contract. ¶56. Tellingly, however, the AC fails to explain what else the $2 billion in "signed contracts" could possibly refer to if it did not include the $1.8 billion PEA contract. Indeed, Gorilla would have to admit that it has never disclosed any signed contracts even approaching that magnitude. And more importantly, the AC fails to allege that Defendants' interpretation of Chandan's statements about $2 billion in "signed contracts" as referring to the PEA deal would somehow demonstrate that Defendants ***knew*** that this understanding was false to satisfy the high bar of actual malice. Allegedly reading Chandan's statements "out of context" is a far cry from sufficiently alleging that Defendants ***actually knew*** their (reasonable) reliance on Gorilla's CEO's own words was wrong.

The AC attempts to engage in even more egregious revisionist history by claiming that Chandan was speaking only "hypothetical[ly]" when he said the PEA would pay Gorilla $180 million in advance on the PEA contract. ¶57; *see also* Mem. at 3, 12, 13. But Chandan's actual words defy Gorilla's attempted spin: on the March 31, 2025 earnings call, Chandan himself stated, "[b]ut if you are looking at someone like the PEA project, ***they are going to pay us*** in

---

These are not theoretical. They are structured commercial agreements with detailed scope, phased delivery schedules and monetization milestones. But if you're looking at someone like the PEA project, for example, they are going to pay us in advance." Ex. 1 at 9-10; https://seekingalpha.com/article/4772089-gorilla-technology-group-inc-grrr-q4-2024-earnings-call-transcript.

advance." ¶53.[4] The AC's obfuscation about "hypothetical scenarios" (¶57) cannot change the fact that there is nothing hypothetical about those words. Nor does Gorilla deny that CFO Bower referred to the agreement as "a mammoth contract" on the same call. *See* n. 4*, supra*. Gorilla can quibble all it wants, but the source materials supporting Defendants' opinions are there for all to see. Further, Chandan's own words undermine any allegation that Defendants published their opinions with knowledge of their falsity sufficient to meet the high bar for actual malice.

### C. The AC's Additional Allegations do not Cure the Pleading Deficiencies as to Defendants' Statements About Gorilla's Claims About the Royal Thai Tourist Police Contract

Like the original Complaint, the AC does nothing to dispel the Report's opinions, nor the basis for those opinions, including the crucial fact that Thai law requires any contract with the Royal Thai Tourist Police ("RTTP") in excess of $60,000 to be publicly disclosed. *See* Mem. at 13-15. That alone supplies ample support for Defendants' opinion about the dubiousness of Gorilla's claim that its deal with the RTTP was valued at anything more than $60,000—let alone $50-$60 million. More importantly, the AC provides nothing to dispute that the Report's statement is properly characterized as an opinion, and Plaintiff itself concedes that the Report provides the bases for Defendants' opinion, which estimated the true value of the RTTP contract at $20-$30,000 USD. Ex. 1 at 11-12. Moreover, the AC entirely fails to challenge any of the disclosed facts which support Defendants' opinion: (a) the Thai $60,000 disclosure requirement,

[4] The context of Chandan's statements bolsters Defendants' interpretation. Chandon was asked: "do the contracts for these large deals provide upfront payments…," to which he responded "yes and no." He then elaborated and provided examples of both: "the educational project in Southeast Asia… is not going to pay us an advanced payment… So no, those customers will not pay us in advance. But if you're looking at someone like the PEA project for example, they are going to pay us in advance…" *See* https://seekingalpha.com/article/4772089-gorilla-technology-group-inc-grrr-q4-2024-earnings-call-transcript. This undermines any suggestion that Defendants published their statements with actual malice.

(b) Culper's source suggesting the deal was a mere trial, (c) Gorilla having formed a subsidiary in Thailand only one week prior to the deal announcement, with capital of only $88,000 USD, and (d) that the Thai law firm engaged to investigate Gorilla's operations and deals in Thailand "found no evidence supporting the Company's investment in Thailand." ¶¶59-61; Ex. 1 at 3-4, 12. Plaintiff's failure to address any of these disclosed facts is fatal to its defamation claim. *See* Mem. at 7-11, 13-15. That failure also refutes the AC's baseless and conclusory allegation that "Defendant's assertion that Gorilla's agreement with the RTTP is 'for about $25,000,' without any clear basis, is the functional equivalent of saying that the deal does not exist." ¶63.

Lastly, while the AC claims that the value of the RTTP deal cannot reasonably be based on the cost to install 100 to 150 cameras (¶64), it provides no rational explanation for Chandan's claim that the deal is valued at $50-$60 million. In any event, it is Plaintiff's burden to allege that Defendants failed to disclose the underlying facts to support their opinion. The AC fails to meet that burden given that Defendants' opinions were reasonably based on the four factors noted above—all of which were disclosed in the Report.

## II. The AC Fails to Plead Defamation as to the New Allegedly Defamatory Statements

### A. The AC Fails to Allege that the Report's Statements Regarding Global Edge Fund and ONE Amazon are Actionable Defamation

The Report raises concerns about Gorilla's announcements in February and March 2025 about a series of deals with ONE Amazon and Global Edge. Ex. 1 at 13-20. As support for its opinions, the Report detailed, at length, the problematic past of ONE Amazon and Global Edge leadership, with hyperlinks to each disclosed fact. *Id.* Examples include that Global Edge CEO Renato da Cruz Costa was "reportedly named as a defendant in dozens of lawsuits in Brazil" accusing Costa of "embezzlement, defrauding investors, [] and writing a bad check to the tune of $350 million" (*id.* at 14-17), and that ONE Amazon CEO Rodrigo Veloso had a "well-

established pattern of making sweeping, headline-grabbing promises, then bailing on these commitments" (*id*. at 17-20).

The AC devotes four pages to alleging that the Report misrepresented those partnerships, ¶¶67-75, but what is glaringly missing is any allegation challenging any of the facts disclosed in the Report supporting Defendants' opinions. *See,* e.g., Ex. 1 at 13-17 (Costa and Veloso had past ties to lawsuits, allegations of stolen rental cars, forged checks, a crypto Ponzi scheme, and previous instances of these individuals enacting similar "bait and switch" schemes). These unchallenged disclosed facts insulate Defendants' opinions from defamation liability.

Instead, the AC accuses the Report of "blatant misrepresentation" in questioning Gorilla's claims to generate billions in revenues from its *Global Edge* relationship (not its ONE Amazon relationship), alleging that this opinion is somehow false because Chandan never stated exactly how much revenue Gorilla would generate. ¶¶67-71. The AC further asserts that the Report defamed Gorilla by suggesting that such a partnership "does not equate to immediate revenue realization" (¶73), a claim the Report simply never makes.

First, the Report, and the sources cited and hyperlinked therein, are replete with instances of Chandan affirmatively asserting the alleged scope of Global Edge's investments and the amounts earmarked for Gorilla as its "sole technology provider." *See* Ex. 1 at 13-14, citing to Gorilla's Mar. 13, 2025 Press Release (Global Edge "has earmarked ***$20 billion*** from its total infrastructure investments **specifically for advancing digital transformation *through Gorilla's cutting-edge solutions***") (emphasis added),[5] and Chandan's March 2025 interview with Costa, in which Chandan claimed that, in addition to Gorilla being the "prime technology provider" for

[5] *See* https://web.archive.org/web/20250313165141/https:/investors.gorilla-technology.com/gorilla-technology-named-exclusive-ai-digital-infrastructure-partner-for-100b-global-edge-fund-raises-2025-revenue-guidance-to-110m-in-schwab-networks-interview/.

Global Edge's "already invested" $100 billion fund, it would also serve that role for Global Edge's intended $20-$25 billion Middle East and South Africa fund, and its intended $50-$100 billion Asia fund.[6]

Second, the Report clearly attributes Gorilla's fantastical claims to $25-$30 billion in revenues to its relationship with ONE Amazon, not Global Edge. *See* Ex. 1 at 14 (quoting Chandan as stating "[ONE AMAZON founder Rodrigo] Veloso is looking at raising anything between $100 billion and $750 billion… ***as per the agreement we have with them, it's between 25% and 30% is what we have agreed to*** for every $100 million that's raised.") (bracketed phrase in original). Unable to dispute the Report's opinions (or their sources), the AC then launches into more straw-man criticism, suggesting that the Report falsely criticized Gorilla's non-existent calls for "immediate revenue realization." But again, neither these words, nor anything like them are found anywhere in the Report.

Ultimately, Plaintiff resorts to the argument that the statements are defamatory because they allegedly confuse Plaintiff's ONE Amazon and Global Edge deals. But that wholly ignores that Chandan himself could not keep his story straight. *See* Chandan's March 2025 LinkedIn post referring to Global Edge CEO Renato Costa as "[m]y close friend and partner ***at OneAmazon***, Renato Costa."[7] In any event, none of the allegations in the AC challenge the foundation of the Report's opinion that these supposed $100 billion plus deals are suspect because Global Edge and ONE Amazon are ***both*** run by individuals with dubious pasts (based on disclosed facts that the AC does not even engage, let alone dispute). And for all of these same

---

[6] *See* Ex. 1 at 14; https://www.youtube.com/watch?v=GGpyh8MJ3VQ&ab_channel=SchwabNetwork.

[7] https://www.linkedin.com/posts/jaychandan_h%C3%A1-espa%C3%A7o-para-investir-at%C3%A9-us-350-bilh%C3%B5es-activity-7300730778643038210-nP9l/; Ex. 1 at 14.

reasons, the AC contains no allegations sufficient to demonstrate that Defendants made their opinions with knowledge of their falsity as necessary to meet the high bar for actual malice.

### B. The AC Fails to Allege that the Report's Statements Regarding Revenue Reporting From Egyptian Government Project are Actionable Defamation

As noted above, the AC concedes by its silence the Report's opinions that Gorilla lied about constructing "20+" data centers across Egypt and elsewhere internationally. Mem. at 5; Ex. 1 at 5, 22-25. Instead, the AC quibbles only with the Report's opinion about Gorilla not receiving a certain $32 million payment from the Egyptian government in 2023. ¶78.

To contextualize the indecipherability of Gorilla's financial statements, the Report begins by noting that Gorilla disclosed that "[i]n 2023, Gorilla reported $52.3 million [in revenues] from Egypt," yet "Gorilla never received the ***2023 payment*** of 1 billion EGP/$32 million USD." Ex. 1 at 25 (emphasis added). The AC incredibly suggests that this simple recitation of the Company's own annual report and financial statements—the raw text of which the Report cited directly below the claim—is somehow defamatory. *See* ¶78, citing Ex. 1 at 25. Gorilla ignores the Report's focus on the temporal nature of Gorilla's statement: Gorilla was not paid ***in 2023***, despite recognizing the associated revenues ***in 2023***. Ex. 1 at 25 (citing Gorilla's Form 20-F). The AC then distorts the Report's statements to suggest that Defendants said Gorilla was *never* paid (¶78), a claim the Report never makes. Indeed, the Report acknowledges the Company's August 2024 press release, in which Gorilla claimed to have received payments for "key deliverables" *after* June 30, 2024. ¶80.

The Report then opines that Gorilla's "disclosures of receivables and contract assets have [] become completely indecipherable." The facts underlying this opinion are set out plainly and accompanied again by Gorilla's own financial statements and press releases (Ex. 1 at 25-27), including (i) Gorilla's errant removal of disclosures of its accounts receivable balances

pertaining to Egypt, (ii) Gorilla's overstated cash balances by marking its Egyptian Pound ("EGP") holdings at 0.055 EGP/USD, even as EGP had wildly devalued to just 0.033 EGP/USD, and (iii) Gorilla's errant reporting of total service revenues, which are disclosed as $64.7 million in one portion of the annual report, but then as $64.5 million in another. *Id.* The AC disputes none of these bases for the Report's opinions. Instead, it quibbles over the Report's reporting of Gorilla's gross cash balance of $45.8 million vs. net cash balance of $11.2 million. Yet this quibbling ignores the substance of the Report's actual concerns, as follows:

> In an August 26, 2024 press release, Gorilla claimed that after June 30, 2024, "all our major clients have completed their payments" which has "increased our free cash reserves to well over $40 million" and current assets to "over $58 million." Yet Gorilla's unaudited financial statements as of June 30, 2024 already reflected $45.8 million in cash and cash equivalents, and $94.7 million in current assets.

*Id*. at 25.

Gorilla mistakenly argues that the Report mis-stated the Company's cash position of gross cash of $45.8 million rather than net cash of $11.2 million. ¶82. First, this claim does nothing to address the reasons for the Report's opinion that "the Company's disclosures of receivables and contract assets have also become completely indecipherable." Ex. 1 at 25. That opinion was based on all of the above, plus Gorilla's reporting of $94.7 million in current assets on June 30, 2024 and then reporting only $58 million in current assets in August of 2024 *after* Gorilla allegedly received the "payments" that were "completed" from "all major clients." *Id.* Had Gorilla truly received such payments *after* June 30, 2024, Gorilla's current assets ***should have increased materially***. To the contrary, however, Gorilla's August 2024 announcement touting the supposed receipt of those payments claimed that its current assets had "increased to over $58 million"—yet this was actually a substantial ***decrease*** of ~$36 million from the figure Gorilla reported as of June 30, 2024—a red flag noted by the Report for which the AC offers no

explanation.[8] Second, contrary to the AC's claims, the Report did not falsely state Gorilla's cash position as of June 30, 2024. ¶82. The Report refers to the Company's June 30, 2024 unaudited financial statements, which display Gorilla's June 30, 2024 position of reported cash and cash equivalents of $11.2 million, gross cash (including time deposits) of $45.8 million (the cash number cited in the Report) (*see* balance sheet excerpt below), and total current assets of $94.7 million. *See* Ex. 1 at 26 (screenshotting excerpt from June 30 2024 financials reflecting total assets). Moreover, Gorilla's August 26, 2024 press release, hyperlinked in the Report, stated that "*free cash reserves* [not cash and cash equivalents] increased to well over $40 million" and that "we *now* have over $58 million in current assets" (*Id*. at 25) (bracketed phrase added).

5. **Cash and cash equivalents**

Link Download

| | June 30, 2024 | December 31, 2023 |
|---|---|---|
| Cash on hand and petty cash | $ 7,521 | $ 7,975 |
| Checking accounts | 20,187 | 44,742 |
| Demand deposits | 11,190,788 | 4,226,503 |
| Time deposits | 34,536,822 | 42,498,552 |
| | 45,755,318 | 46,777,772 |
| Transferred to financial assets at amortized cost | (34,536,822) | (41,470,915) |
| | $ 11,218,496 | $ 5,306,857 |

Tellingly, the balance sheet included in the AC has been edited to exclude the gross cash and total current asset line items. *Compare* ¶82. As with the Reports other opinions, the Report again fully discloses the basis for its views on Gorilla's "indecipherable" financial statements, including both hyperlinks and screenshots of Gorilla's financial statements, which demonstrate the above points. Ex. 1 at 25-27 (screenshotting and hyperlinking Gorilla's financial statements).

## C. The AC Fails to Allege that the Report's Statements Regarding Gorilla's Reporting of Accounts Receivables are Actionable Defamation

The AC makes further unsuccessful attempts to challenge the Report's opinion that

[8] The AC ignores that Gorilla's August 26, 2024 claim that its current assets "grew to more than $58 million" is an incoherent statement given the June 30, 2024 financial statements disclosed $94.7 million in current assets. Ex. 1 at 25.

Gorilla's disclosures regarding its receivables have become "completely indecipherable." ¶¶85-90. Indeed, the AC's convoluted attempt to string together any rational argument here is even more indecipherable than Gorilla's original disclosures themselves, undermining any suggestion that the Report's opinions are actionable defamation. For example, the AC falls flat on its face when it claims that "if the net accounts receivable increases by $15.6 million, then it means Gorilla has achieved milestones for billing to customers and raised invoices to customers *and collected* from some customers." ¶88. Accounts receivable, by their very definition, represent revenues that a Company has recognized, but remain *uncollected*.[9] Similarly, the allegations in paragraphs 89 and 90 are as incomprehensible as they are conclusory, and it is impossible to decipher exactly what Plaintiff alleges is problematic about Defendants' opinions. Finally, none of these inscrutable ramblings challenge that the Report's opinions about the indecipherability of Gorilla's financial statements are pure opinion because they are accompanied by a recitation of facts on which they were based. *See* Ex. 1 at 25-27; Mem. at 8-9.[10]

### D. The AC Fails to Allege that the Report's Statements Regarding Gorilla Related Party Transactions are Actionable Defamation

The AC challenges the Report's opinions that Gorilla failed to properly disclose two deals with Gorilla insiders. Each of these opinions is accompanied by disclosed facts which form the grounds for Defendants' opinions, rendering them inactionable. *See* Mem. at 7-11.

---

[9] https://www.investopedia.com/terms/a/accountsreceivable.asp#:~:text=Accounts%20receivable%20represents%20money%20that,to%20receive%20the%20client's%20payment. ("accounts receivable represents money that a business is owed by its clients, often in the form of unpaid invoices.").

[10] That the Report expresses only inactionable opinions is further evidenced by the Report's language the AC assails. *See* ¶87 (quoting Ex. 1 at 25: "given the overlapping $18.5-18.6 million discrepancies, ***we suspect*** the Company ***may be*** either ***intentionally or unintentionally*** 'mixing up' its classifications.") (emphasis added); *See* Mem. at 8-9 (argument demonstrating such language signals inactionable pure opinion).

The AC nonetheless takes aim at these opinions alleging first that "the identities of the related parties were disclosed by Gorilla and/or public knowledge." ¶93. The AC tries further to thread the needle, arguing that one of these insiders—Muhammad Tofiq Qureshi—"was not a related party at the time [of the transaction], as he was not an employee or director of Gorilla, nor was he related to one." ¶97. But the Report disclosed that its opinions were based on the undisputed facts that (a) Qureshi was previously tied to Gorilla by way of his role as CEO of Innvotec Limited, which was appointed a "Strategic Advisor" to Gorilla prior to the transaction; (b) former Innvotec CEO Amir Kamzi was previously a director of Global SPAC Partners – the entity that took Gorilla public; and (c) Innvotec itself was a shareholder of Gorilla. Ex. 1 at 6, 27-28. The AC does not dispute any of these disclosed facts, making clear that the statements are inactionable pure opinion undermining any suggestion that the statements were made with actual malice.

Lastly, the AC alleges that Gorilla's new auditors have determined that the Report's opinion that the above-mentioned transactions should have been disclosed is "false" and "no curative disclosures were necessary." ¶98. At best, this demonstrates a difference of opinion, but that does not challenge the basis of the Report's opinions, nor render the Report's opinions false or defamatory.[11]

---

[11] The AC also alleges that Gorilla did not acquire SeeQuestor the company, but only its technology. ¶95. Plaintiff alleges that this demonstrates Defendants intentionally lied about the nature of the acquisition to paint Gorilla in a negative light. ¶¶95, 97. The AC ignores, however, that the Company itself announced in November 2022 that it was, in fact, acquiring the company SeeQuestor in an all-stock transaction. *See* https://www.globenewswire.com/news-release/2022/11/03/2548352/0/en/Gorilla-Technology-Group-to-Acquire-Global-Video-Analytics-Provider-SeeQuestor-Limited.html. Thus, it was Gorilla's own press release, rather than some nefarious intent, that accounts for the Report's mistaken assumption.

### III. The AC Continues to Fail to Plead Actual Malice

For all the reasons set forth herein and in Defendants' opening brief, Plaintiff fails to adequately allege actual malice. *See* Mem. At 17-20. The AC's new argument, that Defendants deviated from "widely accepted practice" by not contacting Gorilla directly for comment prior to publishing the Report (¶30), does not cure that failure. *See, e.g., Freeman v. Johnston*, 84 N.Y.2d 52, 58 (1994) (alleged failure to investigate alone, including by conducting additional interviews, will not support a finding of actual malice); Mem. at 18-19.[12]

## CONCLUSION

For all the reasons set forth herein and in Defendants' opening memorandum, Defendants respectfully request that the Amended Complaint be dismissed in its entirety, with prejudice.

Dated: June 5, 2025

**FLEISCHMAN BONNER & ROCCO LLP**

/s/ ____________________

Patrick L. Rocco
Tyler E. Van Put
445 Hamilton Ave., Suite 402
White Plains, New York 10601
Tel: (914) 278-5100

---

[12] Lastly, although entirely irrelevant to Gorilla's claims of defamation, the AC attempts to smear Defendants by falsely suggesting (without any shred of support) that Defendants employed unscrupulous tactics to gather information from current and former Gorilla employees. ¶¶22-23. Yet despite deploying an "internal IT security team perform[ing] forensic analysis," Gorilla cannot link any alleged "unscrupulous" conduct to Defendants, because Defendants have never engaged in such practices. ¶23. Indeed, the Report itself belies Plaintiff's claims by demonstrating that Mr. Lamarco clearly identified himself to PEA officials when conducting his investigation of Gorilla. *See, e.g.*, Ex. 1 at 3 (providing Mr. Lamarco's LinkedIn communications with the PEA), 11. Moreover, long before the issuance of the Report, Gorilla's dubious practices drew criticism from many other market participants. *See, e.g.,* https://x.com/CitronResearch/status/1901649330841400025; https://www.reddit.com/r/wallstreetbets/comments/1j79g1e/grrr_gorilla_technology_group_a_deep_dive_into/; https://x.com/CitronResearch/status/1897679262833942789. Any number of people and entities unrelated to Defendants could have been responsible for the conduct Plaintiff baselessly attributes to Defendants.

Fax: (917) 591-5245
Email: procco@fbrllp.com
tvanput@fbrllp.com

*Counsel for Defendants Shadyside Partners, LLC and Christian Lamarco*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of June 2025, a true and correct copy of the foregoing SUPPLEMENTAL MEMORANDUM OF LAW OF DEFENDANTS SHADYSIDE PARTNERS, LLC AND CHRISTIAN LAMARCO IN SUPPORT OF THEIR MOTION TO DISMISS was filed with the Court through the electronic filing system, which will automatically serve electronic notice of the same on all counsel of record.

/s/ Patrick L. Rocco
Patrick L. Rocco