**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

GORILLA TECHNOLOGY GROUP INC.,

Plaintiff,

-against-

SHADYSIDE PARTNERS, LLC *DBA* CULPER RESEARCH and CHRISTIAN LAMARCO,

Defendants.

Civil Action No. 1:25-cv-3142 (JSR)

**ORAL ARGUMENT REQUESTED**

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT AND SUPPLEMENTAL BRIEF IN SUPPORT THEREOF

PILLSBURY WINTHROP SHAW PITTMAN LLP

Ari M. Berman
David Oliwenstein
Logan Burkhead (*pro hac vice*)
31 West 52nd Street
New York, NY 10019-6131
Tel: (212) 858-1000
Fax: (212) 858-1500
ari.berman@pillsburylaw.com
david.oliwenstein@pillsburylaw.com
logan.burkhead@pillsburylaw.com

*Attorneys for Plaintiff Gorilla Technology Group Inc.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..... 1

FACTUAL BACKGROUND ..... 3

LEGAL STANDARD ..... 8

ARGUMENT ..... 9

I. Gorilla's Detailed Factual Allegations State a Viable Claim for Defamation and Trade Libel Against Defendants ..... 9

A. The Amended Complaint Adequately Pled That Defendants Made False Statements of Fact with Actual Malice ..... 10

i. Defendants' Boilerplate Disclaimer Does Not Transform the Challenged Statements into Protected Opinions 11

ii. Defendants' Use of Qualifying Language Does Not Transform Factual Statements into Protected Opinions 13

B. Defendants Falsely Claimed Gorilla's Hardware Was "Fake" ..... 14

C. Defendants Falsely Claimed Gorilla's Financial Accounting and Disclosure Practices Were A "Total Farce" ..... 17

D. Defendants' Falsely Claim Gorilla's Thai Contracts "Were Fabricated Out of Thin Air" ..... 20

E. Defendants Falsely Claim Gorilla Stated Its Deal with Global Edge Worldwide Fund Was Worth Billions ..... 22

II. GORILLA ADEQUATELY PLED SPECIAL DAMAGES ..... 23

III. DEFENDANTS ARE NOT ENTITLED TO ATTORNEYS' FEES UNDER NEW YORK'S ANTI-SLAPP STATUTE ..... 25

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Amira Nature Foods, Ltd. v. Prescience Point LLC*,
No. 15-cv-09655-VEC (S.D.N.Y. Oct. 17, 2016)....................13

*Arar v. Ashcroft*,
585 F.3d 559 (2d Cir. 2009)....................8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................8, 25

*Banco Popular N. Am. v. Lieberman*,
75 A.D.3d 460 (1st Dep't 2010)....................23, 24

*Biomed Pharms., Inc. v. Oxford Health Plans (N.Y.), Inc.*,
775 F. Supp. 2d 730 (S.D.N.Y. 2011)....................9

*Biro v. Condé Nast*,
807 F.3d 541 (2d Cir. 2015)....................11, 22

*Chau v. Lewis*,
771 F.3d 118 (2d Cir. 2014)....................9, 10, 14

*Church of Scientology Int'l v. Behar*,
238 F.3d 168 (2d Cir. 2001)....................11

*Davis v. Boeheim*,
24 N.Y.3d 262 (2014)....................21, 23

*DiFolco v. MSNBC Cable LLC*,
622 F.3d 104 (2d Cir. 2010)....................9, 25

*Drug Rsch Corp. v. Curtis Publ'g Co.*,
7 N.Y.2d 435 (N.Y. 1960)....................9

*Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*,
194 F. Supp. 3d 263 (S.D.N.Y. 2016)....................9, 24

*GM Photo, LLC v. Focus Camera, Inc.*,
No. 22-CV-10339 (VSB), 2025 WL 1226629 (S.D.N.Y. Apr. 24, 2025)....................14

*Grifols, S.A. v. Yu*,
No. 24-cv-576 (LJL), 2025 WL 1531713 (S.D.N.Y. May 29, 2025).................... *passim*

*L & Leung Leatherware LTD. v. Collection XIIX LTD.*,
No. 17-CV-7374 (PKC), 2021 WL 1026163 (S.D.N.Y. Mar. 16, 2021)................................24

*LifeMD, Inc. v. Lamarco*,
607 F. Supp. 3d 576 (W.D. Pa. 2022)..........................................................4, 10, 12, 14

*Lynch v. City of New York*,
952 F.3d 67 (2d Cir. 2020)..........................................................................................8

*Milkovich v. Lorain J. Co.*
497 U.S. 1 (1990)............................................................................................*passim*

*Nanoviricides, Inc. v. Seeking Alpha, Inc.*,
No. 151908/2014, 2014 WL 2930753 (Sup. Ct. N.Y. Cnty. June 26, 2014)...........................20

*NovaGold Res. Inc. v. J Cap. Rsch. USA LLC*,
No. 20-CV-2875 (LDH) (PK), 2022 WL 900604 (E.D.N.Y. Mar. 28, 2022)................*passim*

*Nunes v. NBCUniversal Media, LLC*,
643 F. Supp. 3d 403 (S.D.N.Y. 2022)...................................................................11, 22

*Palin v. N.Y. Times Co.*,
940 F.3d 804 (2d Cir. 2019)........................................................................................9

*Parks v. Steinbrenner*,
131 A.D.2d 60 (1st Dep't 1987) .................................................................................11, 22

*Prince v. Intercept*,
634 F. Supp. 3d 114 (S.D.N.Y. 2022).............................................................................25

*Ruder & Finn Inc. v. Seaboard Sur. Co.*,
52 N.Y.2d 663 (N.Y. 1981) .........................................................................................9

*Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*,
864 F.3d 236 (2d Cir. 2017)..........................................................................10, 11, 15

*ZAGG, Inc. v. Catanach*,
No. 12-4399, 2012 WL 4462813 (E.D. Pa. Sept. 27, 2012) ...................................................12

Rules and Regulations

Federal Rules of Civil Procedure
Rule 12(b)(6)..........................................................................................................8

## PRELIMINARY STATEMENT[1]

This case is not about upholding free speech or defending the right to participate in a free marketplace of ideas. This case is about protecting the marketplace where these principles are exploited to provide cover for predatory false speech, broadly distributed by financially motivated actors seeking to turn a profit.

In an increasingly familiar pattern, Plaintiff Gorilla Technology Inc. ("Gorilla") was targeted by Defendants Christian Lamarco ("Lamarco") and Shadyside Partners LLC, dba Culper Research ("Culper") (together "Defendants") with a publication purporting to uncover widespread fraud, incompetence, corruption, and misconduct, titled "Gorilla Technology (GRRR): Fake Products, Fabricated Contracts, Fraudulent Partners, Phantom Offices, and Farcical Financials – a Brazen Fraud" (the "Report"). Behind the scenes, Defendants combed the public record for anything that could be spun into a narrative that would damage Gorilla's reputation and sow fear and doubt amongst its shareholders and the public. Unfortunately, Defendants' scheme worked, and Gorilla has suffered substantial damages as a result.

Plaintiff's Amended Complaint pleads in extensive detail how the Report is rife with actionable false assertions of fact, which Defendants published in full view of contradictory evidence, and premised on a purported factual record replete with distorted and incomplete quotes, weak or unidentified "sources," pure conjecture, and plain falsities.

Defendants' claim that Gorilla sells "fake products" is among the most egregiously false and defamatory assertions in the Report. The Report alleges Gorilla merely rebrands off-the-shelf

[1] Capitalized terms otherwise not defined herein are defined in the Amended Complaint (Dkt. 20, "Amended Complaint" or "Am. Compl."). Defendants' Motion to Dismiss (Dkt. 17) is referred to as "Mot." and Defendants' Supplemental Brief in Support of their Motion to Dismiss (Dkt. 21) is referred to as "Suppl. Mot." Emphasis is added unless indicated otherwise.

Dell desktops and Telpo cameras without adding any proprietary value—assertions belied by Gorilla's public product information and disclosures. Gorilla's AI appliances are embedded with proprietary software, developed over two decades, and deployed in hundreds of projects globally. Defendants relied solely on a "reverse image search" and willfully ignored explanatory materials from the same webpages and disclosure statements they cited. The Amended Complaint details how this accusation is objectively false and was intentionally crafted to suggest that Gorilla engaged in deception and fraud with respect to its products and technologies. The Amended Complaint also makes plain how Defendants knew or recklessly disregarded that these claims were false when they made them. This is actionable defamation. *See Grifols, S.A. v. Yu*, No. 24-cv-576 (LJL), 2025 WL 1531713, at *20 (S.D.N.Y. May 29, 2025).

Defendants claims that Gorilla's financial statements contain "glaring errors" and are a "total farce" are equally damaging and false. Am. Compl. ¶¶ 77, 86. For example, Defendants falsely claim Gorilla never received a $32 million payment from the Egyptian government, yet "booked the revenues anyway" (*id.* ¶ 78), even though Gorilla publicly disclosed the payment structure in accord with IFRS revenue recognition principles and confirmed receipt of payment in a press release that Defendants cite in the Report. Defendants also misstate Gorilla's June 30, 2024 cash position, claiming it was $45.8 million in cash and cash equivalents, when Gorilla's public filings reported only $11.2 million—again, information Defendants referenced in their own footnotes. These distortions are not protected opinion. They are false factual assertions, made with actual malice, that caused reputational and economic harm.

Lastly, the Report levels a series of baseless accusations regarding Gorilla's government contracts, corporate partnerships, and related-party transactions, including claims that Gorilla "fabricated" deals with Thai government entities, misrepresented its partnership with Global Edge

Worldwide Services ("Global Edge"), and failed to disclose insider dealings. Each allegation is contradicted by Gorilla's public filings, third-party confirmations, and the inaccuracies and distortions Defendants cite in support of their smears. These statements are actionable because they assert provably false facts and were made with, at a minimum, reckless disregard for the truth.

The Report was not a good-faith exercise in financial analysis or protected opinion journalism—it was a calculated effort to destroy Gorilla's credibility, depress its stock price, and profit from the resulting chaos. The Amended Complaint pleads in detail how Defendants repeatedly ignored public facts, selectively quoted or misquoted sources, and presented falsehoods as fact. These tactics caused significant harm. Because the challenged statements are actionable under well-established defamation and trade libel law—and because Gorilla has plausibly alleged both falsity and actual malice—Defendants' Motion to Dismiss must be denied in its entirety.

## FACTUAL BACKGROUND

Defendants are short sellers who borrow a company's securities, sell those securities short, self-publish disparaging "research" reports about the company to depress the company's stock long enough for them to buy shares back at a lower price before they must return the borrowed securities, and then pocket the difference. Am. Compl. ¶ 1. Defendants have engaged in these tactics since at least 2019. Gorilla is the latest target. *Id.* ¶ 20.

Gorilla was founded in 2001, and, over the last 20 years, it has developed proprietary artificial intelligence technology that uses machine learning and deep learning algorithms to identify, analyze, and extract information from digital content. *Id.* ¶¶ 13-14, 18. This work has resulted in Gorilla being awarded 29 patents to date with 5 more pending. *Id.* ¶ 14. The applications for its technology have been largely focused on video intelligence, content management, and cyber security. *Id.* ¶¶ 13-14. Gorilla operates in eight countries and has

deployed its products to roughly 600 clients across sectors such as government, public services, manufacturing, telecom, retail, transportation, logistics, healthcare, and education. *Id.* ¶¶ 15, 19.

On April 4, 2025, Culper published the Report to its website and further publicized it through a post on X that read as follows: "We are short Gorilla Technology Inc $GRRR – the most ridiculous fraud we've written about: fake products, fabricated deals, fraudulent partners, fictitious offices, and phony financials. We think $GRRR should be halted and delisted." *Id.* ¶¶ 21, 24. The post on X has been viewed tens of thousands of times. *Id.* ¶ 25. Gorilla did not receive any communication through any of its official channels before the Report's publication. *Id.* ¶ 29-30.

Defendants tout themselves as providing "an exhaustive, investigative approach to investment research," that "seek[s] to expose companies which have misrepresented their operations, failed to disclose significant risks, misused capital, possess accounting irregularities, or otherwise deceived investors." *Id.* ¶¶ 4, 11, 20. Defendants omit that on at least one previous occasion, they were sued by one of their target companies for issuing a similar report that contained numerous allegations a District Court found to be actionable for defamation, including unsubstantiated claims of fraud and poor business practices not unlike the statements contained in the Report. *See LifeMD, Inc. v. Lamarco*, 607 F. Supp. 3d 576, 595 (W.D. Pa. 2022).

The Report contains a litany of claims regarding Gorilla's financial condition, disclosures, products, and services. Am. Compl. ¶ 2. For instance, the April 4, 2025 post on X and the title of the Report both refer to Gorilla's products as "fake products." *Id.* ¶ 33. The Report elaborates, stating "Gorilla's technological abilities are practically non-existent," "Gorilla has simply slapped its own logo overtop of a standard Dell desktop PC that anyone can purchase online for less than $500," and Gorilla's "'contactless AI appliance' . . . consists not of any Gorilla-specific technology, but a Telpo camera and a Dell desktop PC which can each be ordered from a number of online

retailers." *Id.* By their own admission, Defendants based these sweeping claims primarily on "a simple reverse image search" of product images taken from Gorilla's website. *Id.* ¶ 35. The Amended Complaint clearly alleges that Defendants willfully ignored contradicting information on Gorilla's website (notably, the same page Defendants sourced the product images) and in its public filings (which Defendants cite and quote repeatedly) that details Gorilla's technology and how Gorilla integrates its proprietary software, secure analytics algorithms, and client-specific customizations into its AI hardware before deployment. *Id.* ¶¶ 36-47.

The Report also alleges Gorilla's financial disclosures contain errors, misrepresentations, and inconsistencies (*id.* ¶¶ 76-91), including that Gorilla never received a payment for one of its projects "but booked the revenues anyway" (*id.* ¶ 78), and Gorilla's "disclosures of receivables and contract assets" include "glaring errors – unexplained shifts in line items and conflicting statements that quite literally do not add up" and suggest Gorilla is "intentionally or unintentionally 'mixing up' its classifications" (*id.* ¶¶ 85-87). Defendants appear to rely entirely on a selective interpretation of Gorilla's May 2024 Form 20-F and October 2024 Form 6-K to support these claims but deliberately ignore publicly available facts. For example, Defendants support their claim that Gorilla never received payment but still booked a payment as revenue by claiming "Gorilla reported $64.7 million in Company-wide revenues, and disclosed that 81% of total revenues, or $52.3 million, was from Egypt" and this number "closely align[ed] with the sum of the advance and the 2023 payment," but ignored a disclosure in the 20-F that stated, "[a]n EGP 1.0 billion payment due in 2023 from the GoE has not yet been received." *Id.* ¶¶ 78-79.

While the payment had not yet been received as of May 2024, the Report falsely claims it was *never* received. In fact, Gorilla received the payment and announced it in an August 26, 2024 press release, stating: "'Gorilla has successfully completed the first two milestones of our major

project in the MENA[2] region. "[A]**ll our major clients have completed their payments**' which has 'increased our free cash reserves to well over $40 million' and current assets to 'over $58 million.'" *Id.* ¶¶ 80-81. The Report summarily dismisses this announcement because they claim the "financial statements as of June 30, 2024 already reflected $45.8 million in cash and cash equivalents, and $94.7 million in current assets" (*id.* ¶ 81), implying Gorilla avoided claiming its assets had increased, because if there was no material change in Gorilla's assets in August 2024, then any claim Gorilla had been paid was false. However, Gorilla's unaudited financial statements as of June 30, 2024 reported $11,218,496 in cash and cash equivalents, not $45.8 million. *Id.* ¶ 82. The Report states the wrong figure and Gorilla's statement that receipt of payment "increased [its] free cash reserves to well over $40 million" was accurate and consistent with its announcement. *Id.* ¶¶ 81-84. The Report also accuses Gorilla of misreporting its accounts receivables because Defendants claim they found "a discrepancy of $18.6 million" between the balance sheet accounts receivable and Gorilla's cash flow and a "glaring difference of $18.5 million" between the increase in contract assets on Gorilla's balance sheet and its cash flow for 1H 2024. *Id.* ¶ 87.

Defendants make a host of claims about Gorilla's project pipeline in which they misquote and misunderstand Gorilla's public statements to accuse Gorilla of lying to investors about its partnerships and projected revenue streams. For example, the Report alleges Gorilla made claims about the existence and terms of projects with Thailand's Provincial Electricity Authority ("PEA") and Royal Thai Tourist Police ("RTTP") that were "Fabricated Out of Thin Air." *Id.* ¶¶ 48, 50, 54, and 59. The Report also asserts Gorilla made explicit claims about billions of dollars in

---

[2] "MENA" stands for "Middle East and North Africa," and is regularly used by Gorilla to describe its contract with the Government of Egypt (which does not always want to be named in press releases).

revenues it expected from projects with Global Edge. *Id.* ¶ 67; Am. Compl., Ex. 1 at 13.

The supposedly false claims Gorilla made about its agreements with the PEA and Global Edge are in fact excerpted partial quotes taken out of context and misinterpreted. *Id.* ¶¶ 53, 55-58. The Report then provides evidence to disprove statements that Gorilla never actually made (e.g., a LinkedIn conversation with an Assistant Manager at the PEA and investigation from a Thai law firm whose review apparently consisted of searching Thai publications and news media for reports of the deal and searching Thai corporate listings for Gorilla's Thai subsidiary). *Id.* ¶¶ 56-57; Am. Compl., Ex. 1 at 10-11. Defendants provide no sources reflecting any express claims from Gorilla about concrete revenue expectations from Global Edge. *Id.* ¶¶ 68-75. The quote from Gorilla's CEO about 25% of all funds raised being allocated to Gorilla for technology and infrastructure development projects related to the One Amazon project, not the Global Edge project, and was not a claim about revenue. *Id.* ¶ 72.

Defendants apparently formed their allegations about the value of the RTTP deal based on statements from anonymous "sources" who spoke with one unidentified individual at the RTTP. Am. Compl., Ex. 1 at 3-4. Defendants claim their conclusion was supported by their understanding that contracts over $60,000 must be publicly disclosed and because Gorilla opened its "Thai subsidiary just a week earlier, on January 13, 2025, with ~$88,000 in capital," and the Thai law firm told them, "We have found no evidence supporting the Company's investment in Thailand." *Id.*, Ex. 1 at 3-4, 11-12.

Finally, Defendants accuse Gorilla of using undisclosed related party transactions to "Loot[] Millions from Company Coffers." Am. Compl. ¶¶ 92-93. Defendants base this accusation on the claim that in 2023, "Gorilla acquired video analytics company named SeeQuestor Limited for $6 million – over 20 times SeeQuestor's book value of 230,000 GBP" and paid "Innvotec a $1

million 'advisory fee' in connection with the acquisition," where "Innvotec was a meaningful shareholder of SeeQuestor prior to its acquisition." *Id.* ¶ 94. However, the transaction was for SeeQuestor's intangible and trade assets at a price that reflected a fair market valuation and the fee to Innvotec was a diligence fee for services as a strategic advisor to Gorilla, which was disclosed to, and approved by, Gorilla's board of directors. *Id.* ¶¶ 95-96.

Immediately following the publication of the Report, Gorilla's stock price fell by $2.14, or 11.27%, to close at $16.85 per share on April 4, 2025. *Id.* ¶ 99. Four days later, Gorilla was informed by its auditor that, due to the accusations in the Report, the firm was required to conduct a mandatory review under Public Company Accounting Oversight Board rules. *Id.* ¶ 100. This mandatory review delayed the release of Gorilla's financial statements by an additional two weeks. *Id.* The delayed release of financial statements resulted in an investment firm postponing Gorilla's access to $200 million of investment capital for roughly one month. *Id.* ¶ 101. Another institutional investor, who was in late-stage discussions with Gorilla to invest an estimated $50–100 million withdrew from discussions based on the Report. *Id.* ¶ 103. Finally, Gorilla has incurred no less than $150,000 in legal fees and $68,700 in fees for professional public relations and crisis management services. *Id.* ¶ 102.

**LEGAL STANDARD**

The Court "in deciding a Rule 12(b)(6) motion to dismiss a complaint, is required to accept all 'well-pleaded factual allegations' in the complaint as true." *Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)) (citations omitted). The Court must also "construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Id.* (quoting *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009)); *see also DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 110-11 (2d Cir. 2010).

## ARGUMENT

### I. Gorilla's Detailed Factual Allegations State a Viable Claim for Defamation and Trade Libel Against Defendants

Under New York law, "a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (citation omitted). To state a claim for trade libel, a plaintiff must adequately plead: "(1) falsity of the statement, (2) publication to a third person, (3) malice (express or implied), and (4) [ ] special damages." *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 291 (S.D.N.Y. 2016) (citations omitted).

Defamation and trade libel claims under New York law closely resemble one another, with several key differences. Defamation applies when a statement "impugns the basic integrity or creditworthiness of a business." *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670 (N.Y. 1981). Trade libel applies when the statement is "libelous of the product." *Drug Rsch Corp. v. Curtis Publ'g Co.*, 7 N.Y.2d 435, 440 (N.Y. 1960); *see also Ruder*, 52 N.Y.2d at 670-71 (distinguishing the two theories). Gorilla meets each element of defamation and trade libel.

To survive a motion to dismiss, the complaint must "adequately identif[y] the purported communication" and indicate "who made the communication, when it was made, and to whom it was communicated." *Biomed Pharms., Inc. v. Oxford Health Plans (N.Y.), Inc.*, 775 F. Supp. 2d 730, 739 (S.D.N.Y. 2011) (citation omitted). For both defamation and trade libel claims, the statements at issue must be statements of fact. *See Grifols*, 2025 WL 1531713, at *9. A statement is "likely to be characterized as fact" if it is "readily understood by the reader to have a precise, unambiguous and definite meaning and can be objectively characterized as true or false." *Chau v. Lewis*, 771 F.3d 118, 128-29 (2d Cir. 2014) (citation omitted).

### A. The Amended Complaint Adequately Pled That Defendants Made False Statements of Fact with Actual Malice

New York courts distinguish between "pure opinion," which is a "statement of opinion . . . accompanied by a recitation of the facts upon which it is based" or a statement that does not imply that it is based on undisclosed facts, and "mixed opinion," which is an opinion that does imply a basis in undisclosed facts, or facts known only to the author. *Id.* (citation omitted). Only a mixed opinion is actionable. *See id.*; *see also Grifols*, 2025 WL 1531713, at *14 (finding a statement that plaintiff did not disclose a related-party loan was a factual statement that was provably false).

In the case of short seller reports, statements that have a "precise, unambiguous and definite meaning" can be actionable even if other statements of opinion contained within are not. *See, e.g.*, *Grifols*, 2025 WL 1531713, at *20. In *Grifols*, defendant short seller issued a report impugning the veracity of plaintiff's financial records, claiming that plaintiff "did not disclose its $95 million loan" to a related party. *Id.* at *13. The District Court determined that this was a factual statement because it was "not presented as a result of interpretation or analysis—it [was] presented as one of the publicly available facts." *Id.* (citation omitted). Despite the report containing other, non-actionable, disparaging opinions, the Court focused on the part of the report that was capable of being proven false. *Id.* at *20; *see also NovaGold Res. Inc. v. J Cap. Rsch. USA LLC*, No. 20-CV-2875 (LDH) (PK), 2022 WL 900604, at *10 (E.D.N.Y. Mar. 28, 2022) (finding statements in a short seller's report were actionable as defamation); *LifeMD*, 607 F. Supp. 3d at 593-95 (finding allegations plaintiff "participated in fraud, lies and illegal business practices" were actionable).

Regarding falsity, "to prevail on a motion to dismiss a plaintiff 'must plead facts that, if proven, would establish that the defendant's statements were not substantially true.'" *NovaGold*, 2022 WL 900604, at *10 (quoting *Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 247 (2d Cir. 2017)). A "statement is substantially

true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* (quoting *Tannerite*, 864 F.3d at 242).

For purposes of this motion, Gorilla assumes (but does not concede) it must plead actual malice. Actual malice is "knowledge that the statements were false or . . . reckless disregard as to their falsity." *Grifols*, 2015 WL 1531713, at *10 (quoting *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015)). Actual malice "does not measure . . . ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication." *Id.* (quoting *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001)). Actual malice may be plausibly alleged by, "among other things, a lack of sourcing for the defamatory statements, "obvious … reasons to doubt the veracity" of the information, or the "inherently improbable nature of the statements themselves."" *Id.* (quoting *Biro*, 807 F.3d at 545) (citation omitted). "[R]eliance on anonymous or unreliable sources without further investigation may support an inference of actual malice." *Nunes v. NBCUniversal Media, LLC*, 643 F. Supp. 3d 403, 419 (S.D.N.Y. 2022) (quoting *Biro*, 807 F.3d at 546). A "mixed opinion" statement may be defamatory even if it is "ostensibly accompanied by a recitation of the underlying facts upon which the opinion is based [if] those underlying facts are either falsely misrepresented or grossly distorted." *Parks v. Steinbrenner*, 131 A.D.2d 60, 62-63 (1st Dep't 1987) (citation omitted); *see also Milkovich*, 497 U.S. at 18-19 ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.").

#### *i. Defendants' Boilerplate Disclaimer Does Not Transform the Challenged Statements into Protected Opinions*

Despite Defendants' arguments to the contrary, (*see* Mot. at 8), "prefatory disclaimers and exculpatory words cannot save the statements at issue from being defamatory . . . 'It would undermine the law of defamation if speakers or authors could simply employ a talismanic word

formula to absolve themselves of slander or libel.'" *LifeMD*, 607 F. Supp. 3d at 594 (quoting *ZAGG, Inc. v. Catanach*, No. 12-4399, 2012 WL 4462813, at *3 (E.D. Pa. Sept. 27, 2012); *see also NovaGold*, 2022 WL 900604 at *5 n.4 ("Defendant is not absolved from defamation liability simply by virtue of being a short-seller or by the inclusion of a blanket disclosure that its Report is an opinion.") (citation omitted). In *NovaGold*, the Court found that despite a short seller's inclusion of a disclaimer in its report, the "broad disclaimer[ ] on [its] own [is] insufficient to cloak the entire Report in the protections afforded opinions." 2022 WL 900604, at *5. The disclaimer in *NovaGold* was even more direct in stating the report was an opinion and the authors held a short position than the one at issue here:

| Report Disclaimer[3] | NovaGold Disclaimer[4] |
|---|---|
| **<u>"Opinion" Language:</u>**<br>"Research may contain forward-looking statements, estimates, projections, and opinions with respect to among other things, certain accounting, legal, and regulatory issues the issuer faces and the potential impact of those issues on its future business, financial condition and results of operations." | **<u>"Opinion" Language:</u>**<br>"Our research and reports express our opinions, which we have based upon generally available information, field research, inferences and deductions through our due diligence and analytical process." |
| **<u>Disclosure of Related Financial Position:</u>**<br>"You should assume that following publication of any research, we are likely to immediately transact in these securities (by increasing and/or decreasing positions and/or risk exposure), continue to trade in these securities for an undefined time period thereafter, and be long, short, or neutral at any time hereafter regardless of our initial recommendation, conclusions, or opinions." | **<u>Disclosure of Related Financial Position:</u>**<br>"[A]s of the publication date of our reports and research, J Capital Research USA LLC may benefit from short positions a client has in all stocks […] covered herein, and therefore stands to realize significant gains in the event that the price of either declines." |

[3] *See* Am. Compl., Ex. 1 at 1.
[4] *See* Ex. A – Jcap Report at 1, *NovaGold Res, Inc v. J. Cap. Rsch. USA LLC*, No. 20-cv-2875 (LDH)(PK), (Dkt. No. 39-1).

The *NovaGold* disclaimer far more explicitly advised the reader of the author's financial position and that the report was the author's opinion, but the Court still concluded the disclaimer could not "cloak the entire Report in the protections afforded opinions." *Id.* at *5.

The Report's attempt to disclaim itself as opinion is contradicted by other statements in the disclaimer and on Culper's website that clearly aim to inspire confidence in the factual assertions contained in Defendants' reports. For example, Defendants' disclaimer states, "[t]o the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the securities covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer." Am. Compl., Ex. 1 at 1. Defendants also tout themselves as providing "an exhaustive, investigative approach to investment research" and boast that Research was recognized in 2021 "as a Top 5 activist short seller by Activist Insight." Am. Compl. ¶¶ 11, 20. Defendants, however, cannot have it both ways, i.e., promote themselves as a source of accurate and reliable research while hiding behind the fig leaf of "opinion" when it suits them.

***ii. Defendants' Use of Qualifying Language Does Not Transform Factual Statements into Protected Opinions***

Defendants contend that terms like "we believe" or "we think" in conjunction with their factual claims transform the statements into protected opinions. *See* Mot. at 8-9. Not surprisingly, courts have made it clear that "[short sellers] cannot avoid liability simply by . . . sprinkling their report[ ] with words that they believe connote opinion." Hr'g Tr. at 59:23-25, *Amira Nature Foods, Ltd. v. Prescience Point LLC*, No. 15-cv-09655-VEC (S.D.N.Y. Oct. 17, 2016), Dkt. No. 66. The Supreme Court has held that "the statement, '[i]n my opinion Jones is a liar,' can cause as much

damage to reputation as the statement 'Jones is a liar,'" and "[s]imply couching such statements in terms of opinion does not dispel the[ir] implications." *Milkovich*, 497 U.S. at 19.[5]

In the prior litigation against Culper and Lamarco for similar misconduct, the District Court reached the same conclusion—rejecting Defendants' "attempts to shield itself from defamatory communications by prefacing the communications with disclaimers such as 'we think' and 'we believe.'" *LifeMD*, 607 F. Supp. 3d at 594. There, the Court found "the Report's prefatory disclaimers and exculpatory words [were] not enough to absolve the communications of defamatory meaning." *Id.* The Court concluded that plaintiffs plausibly alleged Defendants defamed them through a similarly styled short seller report containing the same disclamatory phrases Defendants now again claim should protect their defamatory statements from liability. *Id.*

**B. Defendants Falsely Claimed Gorilla's Hardware Was "Fake"**

Defendants' accusation that Gorilla markets "fake products" is not only false and misleading, but it is also among the most damaging assertions in the Report because it directly undermines the legitimacy of Gorilla's core technology offerings.

The Amended Complaint pleads the Report makes the following factual, defamatory statements regarding Gorilla's product offerings:

| Defendants' Statements |
|---|
| "Gorilla has simply slapped its own logo overtop of a standard Dell desktop PC that anyone can purchase online for less than $500." Am. Compl. ¶ 33. |
| "Gorilla touts its "contactless AI appliance" but this solution again consists not of any Gorilla-specific technology, but a Telpo camera and a Dell desktop PC which can each be ordered from a number of online retailers." *Id.* |

These statements "have a precise, unambiguous and definite meaning and can be objectively characterized as true or false." *Chau*, 771 F.3d at 128 (citation omitted); *see also GM*

[5] Defendants' argument ignores the numerous times in which the Report makes declarative statements of fact devoid of any such qualifications. *See, e.g.,* Am. Compl. ¶¶ 33, 34, 48, 67, 78.

*Photo, LLC v. Focus Camera, Inc.*, No. 22-CV-10339 (VSB), 2025 WL 1226629 at *5 (S.D.N.Y. Apr. 24, 2025) (finding false claims of counterfeit goods "sufficient to withstand motions to dismiss"). Either Gorilla "simply slapped its own logo" on the hardware which "consists not of any Gorilla-specific technology," or it has not. Am. Compl. ¶ 33. At its core, Defendants deny Gorilla developed a novel product that conveys its unique, sophisticated technology solutions. Defendants claim these statements are "pure opinion" because they "set forth the specific factual basis" upon which they rely. Mot. at. 10. But the law does not protect claims where the disclosed underlying "facts are either incorrect or incomplete, or if his assessment of them is erroneous, [as] the statement may still imply a false assertion of fact." *Milkovich*, 497 U.S. at 18-19. The Amended Complaint clearly alleges the bases upon which Defendants rely for the statements above are incorrect and distorted.

The Amended Complaint contains ample facts showing that Defendants' statements are false (*see* Am. Compl. ¶¶ 34-47) and would "have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Tannerite*, 864 F.3d at 242 (citation omitted). Gorilla's products are pre-loaded with its AI technology and augmented for integration into Gorilla's broader solutions offerings. *See* Am. Compl. ¶ 37. Every Gorilla deployment involves a full end-to-end architecture that combines: (1) hardware, such as Smart IoT devices, and Core network infrastructure; (2) software, such as Gorilla's proprietary AI middleware, Computer vision, object recognition, and facial analytics engines, real-time orchestration and threat alerting dashboard, and integration APIs for national systems and legacy platforms; and (3) professional services and operational support. *See id.* Gorilla's website explains at length the various technologies Gorilla installs in its products and includes multiple infographics explaining the benefits and features of its technology and products. *See id.* ¶¶ 41-44. In other words, Gorilla's

technology and products are not "fake," as Defendants falsely allege, but instead involve a mix of Gorilla's 28 patented AI-related technologies and functions that result in advanced and unique products. *See id.* ¶ 40. All of which is amply pled and publicly available on Gorilla's website.

The Amended Complaint alleges Defendants' primary bases for the statements above are a "simple reverse image search" of the products and a cursory review of Gorilla's website and public filings. *See id.* ¶ 35.[6] Yet, the very same webpage contains information and product descriptions explaining how Gorilla's hardware is enabled with proprietary technology and augmented to integrate with Gorilla's broader service offerings, which Defendants willfully excluded from the Report. *See* Am. Compl. ¶¶ 41-42. For example, the "Telpo camera[s]" identified in the Report, contain a description clearly indicating Gorilla converted the device into a "contactless AI appliance for access control that delivers identity verification along with mask and temperature detection." *Id.* ¶ 43. Similarly, Defendants selectively quoted Gorilla's 2023 Form 20-F and ignore that the same document explicitly states that Gorilla's "edge AI IVA Appliances *install Gorilla software* on hardware bundles, resulting in all-in-one solutions." *Id.* ¶ 39 (emphasis added).

Because Defendants cite documents that contain information clarifying the extent to which Gorilla integrates software into its hardware offerings, their knowledge of these facts can be inferred. *See Grifols*, 2025 WL 1531713, at *20 (finding, because defendants cited a specific document that refuted their false claim about nondisclosure, the Court could "infer that the author saw the disclosure and, notwithstanding having seen the disclosure, stated precisely the opposite," and actual malice was "plausibly pled" "[b]ecause the author had obvious . . . reasons to doubt the

[6] Defendants do not contest this allegation. *See* Mot. at 15 ("The Report lays out Defendants' "simple reverse image search.").

veracity of the information he was imparting") (internal quotation marks and citations omitted). The Amended Complaint alleges Defendants had access and cited to documents that contradict their false claims. *See, e.g.*, Am. Compl. ¶¶ 41-42. Nonetheless, Defendants deliberately chose to make false and harmful statements—this clearly meets the pleading requirement for establishing actual malice. *See NovaGold*, 2022 WL 900604, at *9 ("[A]llegations that Defendant had access to relevant truthful facts contradicting the statements in the Report which it chose to ignore or blatantly misrepresent paint a plausible picture of Defendant's willful disregard for the truth.").

### C. Defendants Falsely Claimed Gorilla's Financial Accounting and Disclosure Practices Were A "Total Farce"

Defendants' assertions that Gorilla's financial statements are a "total farce" and riddled with "glaring errors" are demonstrably false and precisely the sort of fact-based statement courts find actionable—particularly where, as here, the statements are contradicted by the very documents Defendants selectively cite and distort in their Report. *See* Am. Compl. ¶¶ 78-91.

The Amended Complaint pleads the following false statements were made by Defendants:

| **Defendants' Statement** |
|---|
| "Gorilla's Financials Are a Total Farce." Am. Compl. ¶ 77. |
| "Gorilla never received the 2023 payment of 1 billion EGP / $32 million USD." *Id.* ¶ 78. |
| "[Gorilla] never received the payment, but booked the revenues anyway." *Id.* |
| "Yet Gorilla's unaudited financial statements as of June 30, 2024 ***already*** reflected $45.8 million in cash and cash equivalents, and $94.7 million in current assets." *Id.* ¶ 81. |
| "Yet Gorilla's unaudited financials include additional glaring errors – unexplained shifts in line items and conflicting statements that quite literally do not add up." *Id.* ¶ 86. |
| "Given the overlapping $18.5-18.6 million discrepancies, we suspect the Company may be either intentionally or unintentionally "mixing up" its classifications." *Id.* ¶ 87. |

All these statements have "precise meaning which is readily understood," and "capable of being proven true or false." *Grifols*, 2025 WL 1531713, at *13. For example, either Gorilla "never received the 2023 payment of 1 billion EGP" or Gorilla did eventually receive the payment; either Gorilla's "unaudited financial statements as of June 30, 2024 already reflected $45.8 million in

cash and cash equivalents, and $94.7 million in current assets," or they did not; either Gorilla's "reported financials include additional glaring errors" and discrepancies, or they are accurate and conform to the applicable accounting rules. Gorilla pleads ample facts to show Defendants' statements are false. *See* Am. Compl. ¶¶ 76-91.

Defendants claim, "Gorilla never received the 2023 payment of 1 billion EGP / $32 million USD." *Id.* ¶ 78. Gorilla's May 2024 Form 20-F acknowledged that the payment from the Government of Egypt had "not yet been received." *Id.* ¶ 79. But once it was received, Gorilla reported on August 26, 2024 that all its "major clients have completed their payments" (*id.* ¶ 80), and consequently, its free cash reserves were increased "to well over $40 million" and current assets to "over $58 million" (*id.* ¶ 81). The Report implies this was a lie and that the "financial statements as of June 30, 2024 ***already*** reflected $45.8 million" indicating Gorilla's cash position had not materially changed. *Id.* This is false because the June 30, 2024 financial statements simply do not reflect $45.8 million in cash and cash equivalents but clearly list $11,218,496 in cash and cash equivalents. *Id.* ¶ 82.

The August 26, 2024 press release unambiguously stated that Gorilla had received the payment, noting "the strong progress and financial health of [its] ongoing [Egypt] project" and confirming Gorilla made "key deliverables," "payments for these deliverables have been received," and Gorilla "significantly increased [its] free cash reserves to well over $40 million." *Id.* ¶ 80. Defendants cannot plausibly deny knowledge of this announcement, as the Report expressly cites the press release. *See* Am. Compl., Ex. 1 at 25. Defendants' claim that Gorilla's June 30, 2024 financial statements "already reflected $45.8 million in cash and cash equivalents"—purporting to show the payment had already been received—is also false. Gorilla clearly reported only $11,218,496 in cash and cash equivalents as of that date. *See* Am. Compl. ¶ 81). Defendants again

must have known this as the Report cited the same financial statements and even included a screenshot of the relevant line item. *See* Am. Compl., Ex. 1 at 26.

Defendants support their allegations about Gorilla's erroneous reporting of its accounts receivables by claiming to have uncovered "a discrepancy of $18.6 million" between the accounts receivable recorded on the balance sheet and Gorilla's cash flow and a "glaring difference of $18.5 million" between the increase in contract assets on Gorilla's balance sheet compared to its cash flow for 1H 2024. Am. Compl. ¶ 86. The Amended Complaint explains in detail how these "discrepancies" identified by Defendants are not "glaring errors." *Id.* ¶¶ 88-91. In compliance with the applicable International Financial Reporting Standards and International Accounting Standards, balance sheets are prepared on an accrual basis—meaning they account for all invoices raised to customers (i.e., both paid and unpaid)—whereas cash flow statements are prepared on a basis that reflects the cash transactions (i.e., paid invoices only). *Id.* ¶ 89. Adding the increases in accounts receivable from the balance sheet and the cash flow statements together is meaningless because the two statements serve different purposes. *Id.* Accordingly, Gorilla is not "intentionally or unintentionally "mixing up" its classifications" as Defendants claim. *See Milkovich*, 497 U.S. at 18-19 ("[I]f those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.").

Once again, Defendants cite to the exact documents that refute the veracity of their false statements. As stated above, Gorilla reported the receipt of the 1 billion EGP payment in an August 26, 2024 press release that Defendants cite in the Report. *See* Am. Compl., Ex. 1 at 25. Likewise, Defendants use the very financial statements that prove the falsity of their claims regarding Gorilla's financial accounting to support their allegations. *See id.* at 26; *see also Milkovich*, 497 U.S. at 18-19 ("[I]f those facts are either incorrect or incomplete, or if his assessment of them is

erroneous, the statement may still imply a false assertion of fact."). In both instances, Defendants "had access to relevant truthful facts contradicting the statements in the Report which it chose to ignore or blatantly misrepresent," which "paint a plausible picture of Defendant's willful disregard for the truth" constituting actual malice. *NovaGold*, 2022 WL 900604, at *9 (citation omitted).

Defendants, at a minimum, recklessly disregarded the truth of Gorilla's financial reporting. Defendants assert the Report did not claim Gorilla never received the 2023 payment of 1 billion EGP, but that the Report merely said Gorilla was not paid *as of May 2024*. *See* Suppl. Mot. at 10 ("The AC then distorts the Report's statements to suggest that Defendants said Gorilla was *never* paid (Am. Compl. ¶ 78), a claim the Report never makes."). But Defendants offer no explanation for how the statement—"Gorilla never received the 2023 payment of 1 billion EGP"—can be understood to mean anything but "Gorilla never received the . . . payment." *Id.* Unlike in other short seller cases in which the Court found that defendant was providing an opinion on the state of the plaintiff's financials, (*see, e.g., Nanoviricides, Inc. v. Seeking Alpha, Inc.*, No. 151908/2014, 2014 WL 2930753, at *2 (Sup. Ct. N.Y. Cnty. June 26, 2014) (finding a statement that plaintiff "burned $33 m in cash over the past nearly 7+ years and done essentially nothing" to be protected opinion)), here, Defendants made a statement of fact that Gorilla never received a specified payment, which is akin to the statement the Court in *Grifols* deemed actionable. *See Grifols*, 2025 WL 1531713, at *20 (finding the statement, "Grifols lent Scranton $95 million in 2018 . . . this loan is undisclosed in Grifols' filings," actionable).

**D. Defendants' Falsely Claim Gorilla's Thai Contracts "Were Fabricated Out of Thin Air"**

Defendants' claim that Gorilla "fabricated" its high-value government contracts in Thailand is false and based on selectively edited statements, misrepresented context, and

anonymous speculation—all of which the Amended Complaint rebuts with detailed factual allegations demonstrating both falsity and actual malice. *See* Am. Compl. ¶¶ 51-58, 60-66.

The Amended Complaint pleads the following false statements were made by Defendants:

| **Defendants' Statements** |
|---|
| "Gorilla's Thailand Deals Were Fabricated Out Of Thin Air…In early 2025, Gorilla announced two blockbuster deals in Thailand that the Company claims are worth nearly $2 billion. We believe both were effectively fabricated." Am. Compl. ¶ 48. |
| "On March 5, 2025, Gorilla claimed to have signed a 15-year, $1.8 billion deal with Thailand's Provincial Electricity Authority ('PEA') for 'smart grid and AI-powered energy transformation' services. Five days later, Gorilla announced the 'formal launch of the initial phases' of the initiative. Chandan insists this is a 'signed contract' and even comes with a 10% ($180 million) prepayment. **We think this is a total lie."** *Id.* ¶ 50. |
| "Chandan claimed the deal to be worth $50 to $60 million. We believe it's for about $25,000." *Id.* ¶ 59. |
| The partnership "actually consists of just 100 to 150 cameras at $200 per camera, or a total purchase price of $20,000 to $30,000 USD," and the contract amounts to "in layman's terms, install cameras." *Id.* |

The above statements have "precise meaning which is readily understood," and "capable of being proven true or false." *Grifols*, 2025 WL 1531713, at *13 (quoting *Davis*, 24 N.Y.3d at 270). The Amended Complaint makes clear that each statement is provably false. *See, e.g.*, Am. Compl. ¶ 56 (clarifying Mr. Chandan's statements "were not explicitly about Thailand, let alone about the agreement with the PEA"); *id.* ¶ 57 (clarifying Mr. Chandan's unedited statements on pre-payment "were unmistakably framed as a hypothetical example made to illustrate a point"); *id.* ¶ 64 (stating "Defendants incorrectly equate the cost of off-the-shelf cameras with the total value of a strategic, multi-year engagement with a major law enforcement agency").

Defendants knowingly and selectively edited Mr. Chandan's statements to fit their narrative regarding Gorilla's agreement with the PEA, and the Amended Complaint provides the full quote that clearly indicates Mr. Chandan was not insist the agreement was a "signed contract," or state that Gorilla would be pre-paid $180 million. *See id.* ¶ 53. Statements, such as those above, can be defamatory even if they are "ostensibly accompanied by a recitation of the underlying facts

upon which the opinion is based, but those underlying facts are either falsely misrepresented or grossly distorted." *Parks*, 131 A.D.2d at 62-63 (citations omitted). Here, failing to provide the full statement amounts to a gross distortion.

Likewise, Defendants' primary support for their claims about Gorilla's contract with the RTTP are unnamed sources who Defendants claim "suggest" that the deal "takes the form of a small trial program whereby Gorilla will deliver just 100 to 150 cameras at a price of roughly $200 per camera." Am. Compl. ¶ 61. Defendants never attempted to verify their claim with Gorilla but, instead, chose to rely on unnamed sources, which supports an inference of actual malice. *See Nunes*, 643 F. Supp. 3d at 419 (quoting *Biro*, 807 F.3d at 546) ("[R]eliance on anonymous or unreliable sources without further investigation may support an inference of actual malice."). The Amended Complaint establishes actual malice through allegations that Defendants had sufficient evidence to doubt the veracity of their claims but chose to publish their false statements anyway.

### E. Defendants Falsely Claim Gorilla Stated Its Deal with Global Edge Worldwide Fund Was Worth Billions

Defendants' assertion that Gorilla falsely claimed entitlement to "hundreds of billions" in revenue from the Global Edge partnership is a clear mischaracterization of Gorilla's public statements, grounded in distortions, omissions, and conflation of separate entities—all of which the Amended Complaint corrects with specific facts showing the statements are provably false and misleading. *See* Am. Compl. ¶¶ 67-75.

The Amended Complaint pleads the following false statements were made by Defendants:

| Defendants' Statements |
|---|
| "Gorilla Claims Hundreds of Billions From Global Edge." Am. Compl. ¶ 67. |
| "Gorilla claims the fund already has $100 billion, will invest hundreds of billions into infrastructure, and that Gorilla will be the 'prime technology provider' and see '25% to 30%' of this spending as direct revenues." *Id.* |

These statements have "a precise meaning which is readily understood" and "capable of being proven true or false." *Grifols*, 2025 WL 1531713, at *13 (quoting *Davis*, 24 N.Y.3d at 270). The Amended Complaint demonstrates that these statements are false. *See, e.g.,* Am. Compl. ¶ 69 (clarifying that Global Edge allocated $20 billion for digital transformation initiatives where Gorilla will serve as the exclusive technology partner and "does not state or imply that Gorilla will receive this entire amount as revenue"); *id.* ¶ 72 (clarifying Mr. Chandan stated that 25% of funds raised by One Amazon—a separate entity from Global Edge—would be allocated to Gorilla).

Defendants again omit the full quote from Gorilla's press release announcing the Global Edge partnership, which does not contain any assertion that it expected to receive "25% to 30%" of $100 billion. *Compare id.* ¶ 68 *to* Am. Compl., Ex. 1 at 13. The Report itself quotes Mr. Chandan, discussing One Amazon—not Global Edge—in which he states that "as per the agreement we have with [One Amazon], it's between 25% and 30% is what we have agreed to for every $100 million that's raised." Am. Compl., Ex. 1 at 14. Even if Defendants claim their statements are based on the facts contained within the Report, "if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Milkovich*, 497 U.S. at 18-19.

## II. GORILLA ADEQUATELY PLED SPECIAL DAMAGES

Trade libel requires a plaintiff to show "special damages" in addition to the other elements discussed above. *Banco Popular N. Am. v. Lieberman*, 75 A.D.3d 460, 462 (1st Dep't 2010). For trade libel claims, the statements must cause special damages "in the form of actual lost dealings." *Lieberman*, 75 A.D.3d at 462 (finding special damages were properly alleged where defendant's counterclaim alleged that plaintiff informed potential lenders defendant's company was in arrears despite knowledge that statement was false resulting in a third-party bank rejecting a long-term

loan application with a favorable interest rate and causing defendant's company to pay over $500,000 in additional interest over the life of a substitute loan).

Gorilla has alleged special damages with specificity. The Amended Complaint details how the Report resulted in a delayed audit, which in conjunction with the Report's allegations, caused an investment firm to delay granting Gorilla access to $200 million in investment capital. Am. Compl. ¶¶ 100-101. Prior to the Report, the investment firm had agreed to a term sheet setting out the agreed-upon $200 million investment, but once the Report was released, the investment firm contacted Gorilla to cancel the deal. *Id.* ¶ 101. Similarly, the Amended Complaint alleges that an additional institutional investor, who was in late-stage discussions with Gorilla about making a $50-100 million investment, withdrew from the discussions and cited the Report as the basis for its withdrawal. *Id.* ¶ 103. Finally, the Amended Complaint lists additional expenses Gorilla was required to pay, in the amount of $150,000 in legal fees and $68,700 in professional service fees, to combat the misrepresentations made by Defendants in the Report. *Id.* ¶ 102.

Gorilla's allegations are not the type of generalized damages that courts have disallowed. *See, e.g.*, *Enigma*, 194 F. Supp. 3d at 292 (dismissing a trade libel claim where the special damages alleged were that plaintiff "has and will continue to suffer significant monetary and reputational injury in amounts that will be proven at trial but that are believed to exceed $75,000"). Instead, the first two categories of damages represent "actual lost dealings" resulting from Defendants' defamatory statements. *Lieberman*, 75 A.D.3d at 462; *see also L & Leung Leatherware LTD. v. Collection XIIX LTD.*, No. 17-CV-7374 (PKC), 2021 WL 1026163, at *8 n.6 (S.D.N.Y. Mar. 16, 2021) (finding allegations that false, derogatory statements "caused special damages . . . in the form of lost dealings with its Customers and business partners" and damages "in an amount to be determined at trial, but believed to be in excess of $4 million" (Dkt. 1 ¶¶ 54-55) were sufficient to

plead special damages for a trade libel claim). Further, Gorilla has pled adequate facts to plausibly connect Defendants' statements to the lost dealings. *See, e.g.*, Am. Compl. ¶ 103 ("The institutional investor explicitly cited the Culper Report as its basis for withdrawing from discussions with Gorilla."). Therefore, the Amended Complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" that Gorilla has suffered special damages. *See DiFolco*, 622 F.3d at 111 (quoting *Ashcroft*, 556 U.S. 662 ).

## III. DEFENDANTS ARE NOT ENTITLED TO ATTORNEYS' FEES UNDER NEW YORK'S ANTI-SLAPP STATUTE

Defendants' request for fees is premature and not properly presented on a motion to dismiss. Furthermore, Defendants are not entitled to fees pursuant to New York's anti-SLAPP law because the fee shifting provision conflicts with federal burdens of proof. *See Prince v. Intercept*, 634 F. Supp. 3d 114, 142 (S.D.N.Y. 2022).

## CONCLUSION

For the reasons stated above, Gorilla respectfully requests that Defendants' Motion to Dismiss be denied in full.

Dated: June 19, 2025
New York, New York

PILLSBURY WINTHROP SHAW PITTMAN LLP

By:______________________________

Ari M. Berman
David Oliwenstein
Logan Burkhead (*pro hac vice*)
31 West 52nd Street
New York, NY 10019-6131
Tel: (212) 858-1000
Fax: (212) 858-1500
ari.berman@pillsburylaw.com
david.oliwenstein@pillsburylaw.com
logan.burkhead@pillsburylaw.com

*Attorneys for Gorilla Technology Group Inc.*