**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GORILLA TECHNOLOGY GROUP, INC.<br><br>Plaintiff,<br><br>-against-<br><br>SHADYSIDE PARTNERS, LLC *DBA* CULPER RESEARCH and CHRISTIAN LAMARCO,<br><br>Defendants. | **ECF CASE**<br><br>**Case No. 1:25-cv-03142-JSR**<br><br>**<u>ORAL ARGUMENT REQUESTED</u>** |

---

**REPLY MEMORANDUM OF LAW OF DEFENDANTS SHADYSIDE PARTNERS, LLC AND CHRISTIAN LAMARCO IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS**

---

Patrick L. Rocco
Tyler E. Van Put
FLEISCHMAN BONNER & ROCCO LLP
445 Hamilton Ave., Suite 402
White Plains, New York 10601
Tel: (914) 278-5100
Fax: (917) 591-5245
Email: procco@fbrllp.com
tvanput@fbrllp.com

*Counsel for Defendants Shadyside Partners, LLC and Christian Lamarco*

Dated: June 27, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

I. The Opposition Ignores New York Law on the Context of the Challenged Statement .......... 1

II. Gorilla Fails to Rebut Defendants' Showing That the Challenged Statements Are Not Actionable Defamation .......... 3

A. Statements About Gorilla's AI Hardware .......... 3

B. Statements About Gorilla's Egyptian Transactions .......... 5

C. Statements About Gorilla's Thai Contracts .......... 6

D. Statements About Gorilla's Financial Disclosures .......... 7

E. Statements About Global Edge Fund and ONE Amazon .......... 10

III. Gorilla Fails to Allege Special Damages .......... 10

## TABLE OF AUTHORITIES

**Case** **Page(s)**

*Amira Nature Foods, Ltd. v. Prescience Point LLC,*
No. 15-cv-09655-VEC (S.D.N.Y. Oct. 17, 2016)……………………………………..3

*Aronson v. Wiersma,*
65 N.Y.2d 592 (1985) ……………………………………………………………...…2

*Chau v. Lewis,*
771 F.3d 118 (2d Cir. 2014) ………………………………………………….……… 1, 2

*Dillon v. City of New York*,
704 N.Y.S.2d 1 (1st Dep't 1999)………………………………………………………7, 8

*Ganske v. Mensch*,
480 F. Supp. 3d 542 (S.D.N.Y. 2020)……………………………………………... 8

*Grifols, S.A. v. Yu*,
2025 WL 1531713 (S.D.N.Y. May 29, 2025)……………………………………... 1, 2, 8, 9

*Immuno AG v. Moor-Jankowski,*
77 N.Y.2d 235 (1991) …………………………………………………...……… 1, 3

*L & Leung Leatherware LTD. v. Collection XIIX LTD*.,
2021 WL 1026163 (S.D.N.Y. Mar. 16, 2021)……………………………………... 10

*LifeMD, Inc. v. Lamarco*,
607 F. Supp. 3d 576 (W.D. Pa. 2022)………………………………………………2

*Long v. Marubeni Am. Corp*.,
406 F. Supp. 2d 285 (S.D.N.Y. 2005)……………………………………………... 9

*Masson v. New Yorker Magazine, Inc*.
501 U.S. 496 (1991)………………………………………………………………...8

*Milkovich v. Lorain J. Co*.,
479 U.S. 1 (1990)…………………………………………………………………...3

*NOVAGOLD Res., Inc. v. J Cap. Rsch. USA LLC,*
2022 WL 900604 (E.D.N.Y. Mar. 28, 2022) ……………………………....…2, 3

*Sandals Resorts Int'l Ltd. v. Google, Inc.,*
86 A.D.3d 32 (App. Div. 2011) …………………..………………………...… 3

Gorilla's Opposition fails to salvage its defamation claims. The statements the AC challenges are researched and supported analyses by a short seller with the classic features of opinion that courts have consistently—indeed, as recently as weeks ago in *Grifols*—held to be non-actionable opinion. In its Opposition, Gorilla ignores both the words and the context of the challenged statements and tries to manufacture a defamation claim by challenging statements (in its brief) that the Report *does not even make*. The Opposition argues one straw man argument after the next, ignoring that the statements in the Report itself are far more limited than Gorilla suggests. More troublingly, Gorilla does not meaningfully address the materials cited in the Report: Gorilla's myriad inconsistencies and misstatements (all of which are cited in the Report and available publicly), which more than amply support the Report's opinions. Ultimately, the Opposition is an exercise in avoiding the statements that are *actually* in the Report and the challenges to those statements that are *actually* pled in the Amended Complaint.

## I. The Opposition Ignores New York Law on the Context of the Challenged Statements

Gorilla's Opposition argues that each piece of context for the challenged statements—the disclaimer at the front of the Report, the short seller disclosure, the qualifying language—is insufficient, *on its own*, to signal opinion. But that is not what Defendants argue. Rather, under New York law, courts are directed to consider the *entire* context of a statement in its totality in conducting the fact versus opinion analysis. *See Grifols, S.A. v. Yu*, 2025 WL 1531713, at *11 (S.D.N.Y. May 29, 2025); *citing Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270, 1281 (1991) (fact versus opinion analysis should "begin[] by looking at the whole communication, its tone and apparent purpose"). Even *Chau v. Lewis*, 771 F.3d 118 (2d Cir. 2014), which Gorilla repeatedly cites, explains that the opinion analysis requires "looking at the full context of the communication in which the statement appears, while also considering the broader social context or setting surrounding the communication." *Id.* at 129 (affirming dismissal of defamation claims). Taken

together, these contextual clues in the Report signal that the statements are intended to be opinion.[1]

The recent decision in *Grifols* highlights the role this contextual analysis plays in deciding a defamation claim on a motion to dismiss. There, the court held that "[c]ourts frequently determine that investment analysis ... constitutes the author's opinion." *Grifols,* at *11 (quotations and citations omitted). The court noted:

> the short-seller is not presumed to have special knowledge or material non-public information that informs its opinions. Thus, a reasonable reader will view the statements in such a report with 'caution.' A statement about a company's finances which, divorced from context, might appear to be a simple statement of fact, may in the context of a short-seller report be understood as an interested opinion which a reasonable reader would independently investigate.

*Id.* at *12. Against this backdrop, the *Grifols* court found that the disclosed short-seller analysis, together with the opinion disclaimer and "repeated[] uses [of] signals of opinion," signaled that all of the alleged defamatory statements in a short-seller research report except one were protected "opinion on Grifols' financial health that is supportive of the short-seller's general negative outlook on the company and its securities, rather than merely factually reporting Grifols' finances." *Id*. The lone statement the *Grifols* court allowed to proceed past the pleading stage—that plaintiff failed to disclose a $95M loan—was demonstrably false, as the loan had been disclosed in the company's financials for years, and defendant even admitted that he was wrong the day after its report was published and the defendant had shorted the stock. *Id.* at *21.

The facts in *NovaGold Res. Inc. v. J Cap. Rsch. USA LLC*, 2022 WL 900604 (E.D.N.Y.

---

[1] Gorilla's heavy reliance on *LifeMD, Inc. v. Lamarco*, 607 F. Supp. 3d 576 (W.D. Pa. 2022) is misplaced given that the court in that case engaged in the opinion versus fact analysis under Pennsylvania, not New York, law. *See Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985). Additionally, the *LifeMD* Court held that defendant "did not disclose factual materials" to support its opinion "that Plaintiffs committed or covered up fraud at Redwood Scientific or have since committed or covered up fraud at LifeMD." *Id.* at 594. Here, to the contrary, all of the bases for each of the Report's opinions are clearly stated and linked for the reader to consider. Br. at 10-17.

Mar. 28, 2022) are also easily distinguishable.[2] Indeed, the court in *NovaGold* noted the importance of "the overall context in which the complained-of statements were made" and discussed various New York short seller cases where courts dismissed similar defamation claims, all of which had features exactly like those in the Culper Report—language of conjecture, a fulsome disclaimer, and a disclosure that defendants were trading in the specific stock that was the subject of their report. *Id.* at *4-6. But—unlike the Culper Report—defendant's report in *Novagold* lacked many of those features. *Id.*; Br. at 3-5, 9-10. Moreover, in *NovaGold* the challenged report itself did not disclose the author was short plaintiff's stock—instead a general disclaimer about a typical short-selling position was only included on defendant's *website*. *NovaGold*, at *5. These features, in addition to the fact that (unlike here) the *NovaGold* plaintiff identified statements in the report regarding the feasibility of the critiqued project that were directly contradicted by documents that the company disclosed (but were not cited in the Report), led the court to deny the motion to dismiss the defamation claim. *Id.* at *9-10. But that same legal analysis applied here supports dismissal of Gorilla's defamation claim.

## II. Gorilla Fails to Rebut Defendants' Showing That the Challenged Statements Are Not Actionable Defamation

**A. Statements About Gorilla's AI Hardware.** Gorilla argues that "[t]he Report

[2] *Milkovich v. Lorain J. Co.*, 479 U.S. 1 (1990) is also inapposite. That case did not involve a public figure, and New York law offers greater protection for opinion than afforded by the Constitution, which formed the basis of the *Milkovich* Court's holding. *See Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 40 (App. Div. 2011); *See also Immuno AG*, 77 N.Y.2d at 252. Gorilla's reliance on *Amira Nature Foods, Ltd. v. Prescience Point LLC*, No. 15-cv-09655-VEC (S.D.N.Y. Oct. 17, 2016), is similarly misplaced. Unlike the Culper Report, the report in *Amira* failed to disclose all its underlying facts and relied upon "false facts." Dkt. No. 66 at 7, 16. Moreover, the report in *Amira* was criticized for its "definitive tenor," noting that defendant used language like "prove" and "truth," phrases noticeably absent from the Culper Report. Dkt. No. 58 at 1, 12-13. Lastly, the *Amira* court found plaintiff "just barely" alleged actual malice, as defendant strategically timed its publication to maximize plaintiff's injury, fabricated statements from supposed insiders, and knew or suspected it had committed error but declined to acknowledge it. Dkt. No. 66 at 58-61. None of those considerations exist here.

alleges Gorilla merely rebrands off-the-shelf Dell desktops and Telpo cameras without adding any proprietary value"—and then spends pages rebutting this proposition. Op. at 1-2.[3] But the Report contains no such statement, and Gorilla's straw man argument is irrelevant. As Defendants made clear in their Opening Brief, the actual statements that Gorilla challenges relate to the Report's opinions about Gorilla's non-existent AI ***hardware***. Br. at 4, 15-16. These are the disclosed facts to support the Report's opinion that Gorilla "appears … to sell commoditized hardware that the Company doesn't even manufacture itself." The full context of the challenged statement, which Gorilla ignores, makes this clear:

> Gorilla and its CEO Jay Chandan now promote the Company as a "dominant" provider of "AI hardware" and services across the globe. Gorilla's website showcases this so-called "AI hardware." A simple reverse image search reveals that Gorilla has merely slapped its own logo on top of old Dell desktop PCs and Telpo cameras, readily available for purchase on eBay or any number of online retailers for a few hundred dollars.
>
> …
>
> Gorilla appears to instead sell commoditized hardware that the Company doesn't even manufacture itself. For example, Gorilla claims to offer what it calls "Video Analytics AI hardware" as shown below. Yet a closer inspection of this supposed "AI hardware" reveals that **Gorilla has simply slapped its own logo overtop of a standard Dell desktop PC that anyone can purchase online for less than $500**.

Ex. 1 at 2, 7.[4] When viewed in context, the very words of the Report belie Gorilla's claim that Defendants' statement that "Gorilla's technological capabilities are practically non-existent" (Op. 4) refers to anything other than Gorilla's claims that it manufactures proprietary AI *hardware*, as

---

[3] References to "Op. at __" refer to specific page numbers of Gorilla's June 19, 2025 opposition brief (ECF No. 22). References to "Br. at __" refer to specific page numbers of Defendants' May 22, 2025 moving brief (ECF No. 17); references to "SB at __" refer to specific page numbers of Defendants' June 25, 2025 supplemental brief (ECF No. 21). References to "Ex. 1 at __" refer to Exhibit 1 to the AC (ECF No. 20-1).

[4] This complete statement from the Report also contradicts Gorilla's specious claim that "[a]t its core, Defendants deny Gorilla developed a novel product that conveys its unique, sophisticated technology solutions." Op. at 15. In fact, the Report includes no such denial, focusing instead only on Gorilla's false statements regarding its non-existent AI *hardware*. Ex. 1 at 2, 7.

the very next sentence notes: "Gorilla appears to instead sell commoditized hardware that the Company doesn't even manufacture itself." Ex. 1 at 8.

Against this backdrop, the two challenged statements are obviously the disclosed factual support for the Report's opinion about Gorilla's hardware. The first of those statements—that Gorilla's "Video Analytics AI hardware" looks like the Gorilla logo on a Dell desktop PC, replete with side-by-side picture analysis (Ex. 1 at 8)—is the interpretation and analysis of the disclosed side-by-side pictures. Gorilla's silence on *this statement* about its *hardware* concedes it is accurate. *See* Br. at 4, 15-16; SB at 2-4.

The second statement that Gorilla challenges, namely the statement about Gorilla's 'contactless AI appliance,' is also the support for the Report's opinion about Gorilla's hardware. The Report reasons (based on disclosed side-by-side pictures) that the "AI appliance" consists of "a Telpo camera and a Dell desktop PC which can each be ordered from a number of online retailers." Op. at 14. But this statement, too, is itself disclosed factual support for the Report's opinion about the limitations of Gorilla's alleged "AI Hardware"—and has nothing at all to do with the proprietary software Gorilla allegedly adds to store-bought hardware.

**B. Statements About Gorilla's Egyptian Transactions.**[5] Similarly, Gorilla mischaracterizes the Report by arguing that "Defendants falsely claim Gorilla *never* received a $32 million payment from the Egyptian government, yet 'booked the revenues anyway.'" Op. at 2 (emphasis added), 5. Again, the Report makes no such statement. Instead, the Report notes that Gorilla recognized $32M of Egyptian revenue ***in 2023*** but did not receive any Egyptian payment

[5] Tellingly, Gorilla's Opposition concedes by its silence the accuracy of the Report's opinions that Gorilla lied about constructing "20+" data centers across Egypt and elsewhere internationally (Ex. 1 at 5, 22-25; Br. at 5; SB at 2, 10), as well as the Report's opinions about Gorilla's misrepresentations regarding its US headquarters, undisclosed related-party deals, Gorilla's partnership with BroadSat, and the red flags concerning Gorilla's replacement of its auditor and former CFO. Br. at 4.

***in 2023,*** when that payment was due. SB at 10. Gorilla does not dispute that it did not receive the payment in 2023, undermining the falsity and actual malice prerequisites for a defamation claim. In a desperate attempt to manufacture an issue, Gorilla nonsensically argues that the Report's claim that "Gorilla never received ***the 2023 payment*** of 1 billion EGP [$32M]," can only be understood to mean that Gorilla *never* received the payment *at any time*. Op. at 20 (emphasis added). This contrived read of an excerpt taken out of context is belied by the Report's full statement, which makes clear that it is talking about Gorilla's failure to receive payment that was due *in 2023*. *See* Ex. 1 at 25. But even considering this statement in isolation, Gorilla's claim that the reader must ignore the date modifier—"2023"—and understand this statement to mean that "Gorilla *never* received the . . . payment" is preposterous, especially because the Report acknowledges the Company's August *2024* press release, in which Gorilla claimed to have received payment after June 30, 2024. Ex. 1 at 25; AC ¶80.

**C. Statements About Gorilla's Thai Contracts.** Gorilla purports to challenge four of the Report's criticisms of Gorilla's alleged contracts with the Thai PEA and the RTTP which it claims "have 'precise meaning which is readily understood,' and 'capable of being true or false.'" Op. at 21. But Gorilla ignores the fact that the statements are replete with language of conjecture and are interpretations of fully disclosed facts and public sources. Critically, the Opposition fails to respond to Defendants' arguments demonstrating the deficiency of the AC's allegations as to these challenged statements. For example, regarding the purported PEA contract, Gorilla ignores that the Report relied on a (fully disclosed) Company statement clearly demonstrating that Gorilla's CEO was not speaking hypothetically when he said that the PEA was going to pay Gorilla 10% of the contract in advance. *See* SB at 5-6 ("Chandan himself stated, "[b]ut if you are looking at someone like the PEA project, ***they are going to pay us*** in advance.") (emphasis added), *quoting* Gorilla's March 31, 2025 earnings call. Unable to rebut that argument, Gorilla merely relies on

the AC's spin which is contradicted by Chandan's actual words. *See* Op. at 21 ("Mr. Chandan's unedited statements on pre-payment 'were unmistakably framed as a hypothetical example made to illustrate a point'"), *quoting* ¶57. This unsupported spin is not enough to demonstrate the falsity of the challenged statement or that it was made with actual malice.

Similarly, Gorilla merely repeats the AC's allegation that Chandan's statements about a signed $1.8 billion contract "'were not explicitly about Thailand, let alone about the agreement with the PEA'" (Op. at 21, quoting ¶56), without ever responding to Defendants' argument that Chandan's statements (and the statement of Gorilla's CFO regarding the "mammoth" PEA contract) could only have reasonably been understood to refer to that PEA contract. SB at 4, n.3, 5. Defendants' reasonable interpretation undermines any suggestion of actual malice.

Lastly, Gorilla falsely claims that the Report's "primary support" for its opinions about Gorilla's contract with the RTTP "are unnamed sources." Op. at 22. That argument blatantly ignores that, in addition to a host of other disclosed sources, the Report relied primarily on the fact—which Gorilla *does not dispute*—that Thai law requires public disclosure of *any* contracts exceeding $60,000 in value, and no such disclosures were made. Br. at 11-12; SB at 6-7; Ex. 1 at 11-12. Gorilla offers no explanation how it could possibly have a contract with the RTTP worth anything more than $60,000—let alone $50-$60 million—without such a mandatory disclosure. Indeed, this disclosed and unrebutted fact in support of the opinion is fatal to any actual malice as to this challenged statement.

**D. Statements About Gorilla's Financial Disclosures.** Gorilla's suggestion that the Report's stated opinion that Gorilla's financial statements "are a total farce" is a statement of fact "'capable of being proven true or false'" (Op. at 17) is completely at odds with New York law cited in Defendants' opening brief, which Gorilla does not even challenge. *See* Br. at 10, citing *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (1st Dep't 1999) ("loose, figurative or hyperbolic

statements, even if deprecating the plaintiff, are not actionable"); *Ganske v. Mensch*, 480 F. Supp. 3d 542, 553-54 (S.D.N.Y. 2020) (same). Moreover, where, as here, such statements are preceded by disclaimers and language of conjecture, and are supported by fully-disclosed underlying facts, they are protected as inactionable pure opinion. *See* Br. at 7-16; *See also Grifols*, at *12, 15-16.

The Report opines that "[t]he Company's disclosures of receivables and contract assets (*i.e.,* unbilled receivables) have also become completely indecipherable"—an opinion amply supported by numerous inconsistencies the Report discloses in Gorilla's publicly available financial reporting. *See* Ex. 1 at 25-27; SB at 10-11. Gorilla challenges this opinion by taking aim at the Report's statement, again taken out of context, that "'Gorilla's unaudited financial statements as of June 30, 2024 already reflected $45.8 million in cash and cash equivalents, and $94.7 million in current assets.'" Op. at 17. That was just one of numerous Gorilla financial disclosures used to support the Report's opinion about Gorilla's "indecipherable" disclosures, the full context of which is discussed at SB at 10-11. Gorilla's nonsensical attack avoids addressing the Report's actual criticism. The Report notes that Gorilla's June 30, 2024 financial statements disclosed $45.8 million in gross cash reserves and $94.7 million in current assets, while Gorilla's August 2024 press release claimed that *after* June 30, 2024, Gorilla received payments which "*increased* our free cash reserves to well over $40 million" and current assets to "over $58 million." *See* SB at 10-11; Ex. 1 at 25. In reality, those August numbers were substantial *declines* from the figures Gorilla reported as of June 30, 2024—again supporting Culper's view (which remains unchallenged by Gorilla) that "the Company's disclosures... have become completely indecipherable."[6]

[6] Here, the Report is accurate, but notably even minor inaccuracies cannot amount to defamation. *See, e.g.*, *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) ("Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'") (citation omitted).

Gorilla also attempts to make sense of the gibberish in the AC regarding its reporting of receivables and contract assets, which the Report also opines are "indecipherable." *See* Op. at 5-6, 19; cf. SB at 10-13. First, Gorilla cannot properly rely on allegations that they failed to make in the AC. *See, e.g., Long v. Marubeni Am. Corp.*, 406 F. Supp. 2d 285, 301–02 (S.D.N.Y. 2005) ("A motion to dismiss is directed to the complaint, and not to theories spun out in plaintiffs' opposition papers"). But, even if the Court were to consider Gorilla's most recent attempt at an explanation, it falls far short of demonstrating defamation. The only opinion in this section of the Report that Gorilla challenges is that "[t]he Company's disclosures of receivables and contract assets (*i.e.*, unbilled receivables) have also become completely indecipherable." Ex. 1 at 25. To support that opinion, the Report simply quotes various sections of Gorilla's financial statements over time and explains why Defendants believe they are in conflict.[7] Gorilla cites no case to even suggest that a report's interpretation of a company's financial disclosures so clearly couched as opinion could ever constitute defamation; nor could they. *See* SB at 10-13; *Grifols*, at *15-17.

Similarly, Gorilla's general claim that the Report "misquotes and misunderstands Gorilla's public statements to accuse Gorilla of lying to investors about its partnerships and projected revenue streams" and "misinterpret[s]" Gorilla's statements about its PEA contract and deal with Global Edge (Op. at 6-7) merely reinforces that the Report was expressing opinions—not facts. The Report links to and quotes the Gorilla statements on which Defendants are opining and makes

[7] The last paragraph on page 25 of the Report recounts the differences in Gorilla's balance sheet reporting and statements of cash flow. Ex. 1 at 25. The Report merely observed that Gorilla reported receivables increased by $15.6 million—*i.e.*, the Company did not receive $15.6 million in cash for which it reported revenues. Thus, one would expect that the cash flow statement would reflect a cash draw of $15.6 million related to accounts receivable for the $15.6 million that Gorilla did not receive. Instead, as the Report observed, receivables contributed a ***positive $3.1 million*** to reported cash flows (implying that Gorilla collected not only in full on its current accounts receivables, but also an additional $3.1 million on receivables from prior periods). The Report points out that these two numbers typically align, but in this case, they do not.

clear that Defendants are providing their interpretation of those statements. This places such statements well with the realm of protected pure opinion. Br. at 10-11; S.B. at 4. Finally, the Opposition fails to point to any plausible allegations to satisfy actual malice as to this challenged statement.

**E. Statements About Global Edge Fund and ONE Amazon.** Gorilla fails entirely to address the AC's fatally deficient allegations regarding the Report's statements about ONE Amazon and Global Edge. *See* SB at 7-10. Instead, Gorilla merely repeats the flawed allegations of the AC, without ever challenging, let alone demonstrating the falsity of, the Report's opinion that the Company's fantastical claim to have struck a deal for 25% to 30% of a mammoth $100 billion fund is suspect because the principals of ONE Amazon (Veloso) and Global Edge (Costa) have checkered pasts, including charges of "embezzlement, defrauding investors, [] and writing a bad check to the tune of $350 million" (*id*. at 14-17), and a "well- established pattern of making sweeping, headline-grabbing promises, then bailing on these commitments" (*id*. at 17-20); *see also* Ex. 1 at 4, 13-17. Absent an allegation of falsity, or any well-pled allegation that the statements were *knowingly* false, these statements cannot support a claim for defamation.

## III. Gorilla Fails to Allege Special Damages

As demonstrated in Defendants' moving brief, the AC fails to adequately allege special damages because, among other things, it fails to identify the unnamed investors who allegedly delayed or withdrew funding from Gorilla because of the Report. *See* Br. at 21-23. Rather than cure that deficiency, Gorilla relies on *dicta* in a footnote in *L & Leung Leatherware LTD. v. Collection XIIX LTD.*, No. 17-CV-7374 (PKC), 2021 WL 1026163 at *8, n.6 (S.D.N.Y. Mar. 16, 2021), a summary judgment case not about pleading standards, and selectively quote only from the charging paragraphs of the *Leung* Complaint, while ignoring that the Complaint elsewhere identified *by name* the many "Customers" at issue. See *L & Leung* Dkt. No. 1 at ¶22.

Dated: June 27, 2025

**FLEISCHMAN BONNER & ROCCO LLP**

/s/ ______________________

Patrick L. Rocco
Tyler E. Van Put
445 Hamilton Ave., Suite 402
White Plains, New York 10601
Tel: (914) 278-5100
Fax: (917) 591-5245
Email: procco@fbrllp.com
tvanput@fbrllp.com

*Counsel for Defendants Shadyside Partners, LLC and Christian Lamarco*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of June 2025, a true and correct copy of the foregoing REPLY MEMORANDUM OF LAW OF DEFENDANTS SHADYSIDE PARTNERS, LLC AND CHRISTIAN LAMARCO IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS was filed with the Court through the electronic filing system, which will automatically serve electronic notice of the same on all counsel of record.

/s/ Patrick L. Rocco
Patrick L. Rocco